**R. Stockton RUSH, III, Plaintiff,**

v.

**OPPENHEIMER & CO., INC., and Scott Seskis, Defendants.**

**No. 84 Civ. 3219 (RWS).**

United States District Court, S.D. New York.

March 8, 1988.

Christopher Lovell, P.C., New York City, for plaintiff.

Gold, Farrell & Marks, New York City, for defendant Oppenheimer & Co., Inc.; Martin Gold, of counsel.

Shanley & Fisher, New York City, for defendant Scott Seskis; Matthew Farley, of counsel.

## OPINION

SWEET, District Judge.

Defendants Oppenheimer & Co., Inc. ("Oppenheimer") and Scott Seskis ("Seskis") (together, "Oppenheimer") have moved for an order pursuant to Fed.R.Civ.P. 50(b) setting aside the jury verdict received January 21, 1988 and compelling arbitration of all of plaintiff R. Stockton Rush's ("Rush")

claims. In the alternative, defendants have moved for an order granting a new trial pursuant to Fed.R.Civ.P. 59(a) or for an order staying these proceedings pending appeal pursuant to Fed.R.Civ.P. 8. Upon the findings and conclusions set forth below, the motion for judgment n.o.v. is granted.

### Prior Proceedings

Rush commenced this action on March 4, 1984 against Oppenheimer and Seskis, formerly a broker at Oppenheimer, asserting federal securities, RICO and pendant common law claims. Since the dismissal of Rush's RICO claim, the arbitrability of Rush's remaining claims [1] has consumed the attention of the court and the parties and been the subject of several prior opinions, familiarity with which is assumed. A brief review of those opinions is necessary to provide proper perspective for the conclusions here stated. On March 22, 1985, Oppenheimer's motion to sever Rush's common law claims and compel their arbitration was denied on the grounds that defendants had waived their right to seek arbitration. The Court of Appeals reversed on the issue of waiver and remanded for a determination of whether the agreement to arbitrate itself was induced by fraud.[2] *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 890 (2d Cir.1985).

By the opinion of December 23, 1986, Oppenheimer's motion for summary judgment on the preliminary issue of fraudulent inducement was denied on the grounds that a material issue of fact existed as to whether defendants had wrongly induced Rush to agree to arbitrate all claims arising out of his account with Oppenheimer and that under the Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), Rush was entitled to a jury trial to resolve that issue. For the same reason, the opinion of September 18, 1987 denied Oppenheimer's motion, following the Supreme Court's recent decision in *Shearson/American Express, Inc. v. McMahon,* — U.S. ——, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), for an order compelling the arbitration of Rush's federal securities and pendant state law claims. The September 18 Opinion observed that the Court's decision in *McMahon* had not obviated the requirement under *Prima Paint* and § 4 of the Federal Arbitration Act (the "Act"), 9 U.S.C. § 1 *et seq.*, that a federal court resolve claims as to illegality in the making of an agreement to arbitrate.

### The Trial

The issue of whether Rush was induced to enter into the arbitration agreement by defendants' material or fraudulent misstatements was tried before a jury in January 1988.[3] After three days of testimony

---

1. Paragraph 16 of the Oppenheimer margin agreement that Rush signed on November 30, 1981 provides in part:

    Any controversy between you and the undersigned arising out of, or relating to this agreement, or the breach thereof, or arising out of transactions with you shall be settled by arbitration in accordance with the Rules, then obtaining, of either the National Association of Securities Dealers, Inc. or of the New York Stock Exchange, Inc. as I may elect. If I do not make such election by registered mail addressed to you at your main office within five days after receipt of notification from you requesting such election, then you may make such election.

2. Although Rush's amended complaint, filed August 23, 1984, did not allege that Rush had been fraudulently induced to agree to arbitration, Rush's memorandum of law filed in opposition to defendants' motion to sever the common law claims and compel their arbitration alleged that Rush "has no obligation to arbitrate his common law claims because any purported agree-

ment to such provision in defendant Oppenheimer's form Customer Agreement was ... fraudulently induced...." Rush reiterated this claim in his brief to the Second Circuit. Given the nature of the Court of Appeal's order on remand with respect to the issue of fraudulent inducement, Rush's initial pleadings did not preclude him from raising the issue in subsequent submissions to the court. Thus, in light of all the circumstances, Rush properly raised an issue of fact as to his claim of fraudulent inducement in connection with the making of the agreement to arbitrate. *Cf. Letizie v. Prudential Bache Securities, Inc.*, 802 F.2d 1185, 1188–89 n. 4 (9th Cir.1986).

3. Although it is well-settled that federal common law determines the scope and enforceability of agreements to arbitrate, *see Guinness–Harp v. Joseph Schlitz Brewing Co.*, 613 F.2d 468, 472 (2d Cir.1980); *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 406–08 (2d Cir.1959), it is equally well-settled that issues relating to the "making of an agreement to arbi-

and exhibits, defendants' motion for a directed verdict was denied, and the case was submitted to the jury. The jury found that defendants had made statements that pertained to and were false as to the arbitration clause and that Rush had established the necessary elements for rescission of the agreement to arbitrate.[4] In particular, the jury found that Seskis had told Rush that the Oppenheimer margin agreement "was a formality which Rush was not required to read and was the same as the agreement he had previously signed at Drexel Burnham." [5]

Following the submission of briefs from both parties, oral argument was held on the instant motion on February 4, 1988.

*Standards for Judgment NOV*

Fed.R.Civ.P. 50(b) provides that "[w]henever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." As to the trial court's review of the jury's findings, the standards governing a motion for the entry of judgment notwithstanding the verdict in this Circuit are well-settled:

> [W]hen deciding whether to grant a judgment n.o.v., the trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Rather, after viewing the evidence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgment n.o.v. only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Mattivi v. South African Marine Corp, "Huguenot"*, 618 F.2d 163, 167–68 (2d Cir. 1980); *accord Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 121–22 (2d Cir.1984). Defendants' motion both raises legal questions and challenges the sufficiency of the evidence supporting the verdict.

---

trate" are resolved according to state contract law. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. at 404 n. 12, 87 S.Ct. at 1806 n. 12; *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 845 (2d Cir.1987) ("generally accepted principles of contract law"); *Supak & Sons Mfg. Co. v. Pervel Indus., Inc.,* 593 F.2d 135, 137 (4th Cir.1979); *Trafalgar Shipping Co. v. International Milling Co.,* 401 F.2d 568, 573 (2d Cir.1968); *Duplan Corp. v. W.B. Davis Hosiery Mills,* 442 F.Supp. 86, 87–88 (S.D.N.Y.1977). As the Court stated in *Duplan Corp.,* 442 F.Supp. at 88, "[t]he question whether a valid arbitration clause exists involves general contract principles; state law governs the disposition of that issue."

Thus, the jury was instructed on the elements that Rush was required to prove under New York law to void the arbitration agreement on the grounds of either material misstatement or fraudulent misstatement.

**4.** The jury answered in the affirmative to each of the following questions on the Special Verdict Form:

*Material Misstatement*

1. Did Seskis tell Rush that the margin agreement was a formality which Rush was not required to read and was the same as the agreement he had previously signed at Drexel Burnham?

2. If you answered YES to Question 1, did the statement pertain to the arbitration clause?
3. Was the statement made by Seskis false as to the arbitration clause?
4. Was the statement material?
5. Was the statement an opinion?
6. If you answered YES to Question 5, did Seskis stand in a position of trust with respect to Rush?
7. Did Seskis have special knowledge and know that Rush did not and was relying on his skill as an expert?
8. Did Rush justifiably rely on the statement?

*Fraudulent Misstatement*

9. Did Seskis have the confidence that he stated or implied in the truth of the statement he made to Rush?
10. Did Seskis know that he did not have the basis that he stated or implied for the assertion?
11. Did Rush justifiably rely on the statement made by Seskis?

**5.** Rush had initially opened a securities account with Drexel Burnham Lambert ("Drexel") in early 1981. Seskis was Rush's broker at Drexel at the time Rush opened his first account. When Seskis moved from Drexel to Oppenheimer in the fall of 1981, he invited Rush to transfer his account from Drexel to Oppenheimer.

The principal legal question raised by Oppenheimer's motion is whether the jury was properly instructed on what has been referred to during the course of this litigation as the *Prima Paint* issue. Section 4 of the Act, 9 U.S.C. § 4, instructs a federal court to order arbitration to proceed once it is satisfied that "the making of the agreement for arbitration ... is not in issue." As will be discussed more fully below, in *Prima Paint*, the Supreme Court held that "if the claim is fraud in the inducement of the arbitration clause itself—an issue that goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Prima Paint*, 388 U.S. at 403–04, 87 S.Ct. at 1806. Oppenheimer contends that *Prima Paint* permits federal adjudication of the fraudulent inducement issue *only* if the claim of fraud or misrepresentation relates *exclusively* to the making of the arbitration clause and that since there was no evidence that the statements made by Seskis related only to the arbitration clause, as opposed to the margin agreement generally, the fraudulent inducement issue was for the arbitrator and never should have been submitted to the jury.

In addition, Oppenheimer contends that there was no evidence to support the jury's findings as to the elements of fraudulent or material misrepresentation. In particular, Oppenheimer argues that Rush failed to establish (1) that the statements made by Seskis were false, (2) that they were material, (3) that Rush justifiably relied on them, (4) and that Seskis's statements were actionable statements of opinion.[6]

### The Prima Paint Issue

*Prima Paint* involved an action for rescission of a consulting agreement between a paint manufacturer and a company seeking to acquire its assets. The consulting agreement contained a broad arbitration clause providing that "[a]ny controversy ... arising out of this agreement, or the breach thereof, shall be settled by arbitration in the City of New York in accordance with the rules ... of the American Arbitration Association." Over Prima's objection that the consulting agreement had been induced by fraud,[7] the district court stayed the action pending arbitration, and the Court of Appeals for this Circuit dismissed Prima's appeal. Affirming the decision below, the Supreme Court held that, in passing upon an application under § 3 of the Act for a stay pending arbitration, "a federal court may consider only issues relating to the making and performance of the agreement to arbitrate." *Prima Paint*, 388 U.S. at 404, 87 S.Ct. at 1806. The Court found that,

no claim has been advanced by Prima Paint that F & C fraudulently induced it to enter into the agreement to arbitrate "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof." This contractual language is easily broad enough to encom-

6. In accordance with New York law, the jury was instructed that the agreement to arbitrate was revocable if Rush could establish that his consent was induced by either a material misstatement or a fraudulent misstatement. As to his equitable claim for rescission based on material misstatement, Rush did not have to establish that Seskis knowingly made false statements but only that Seskis made a statement that was false as to the arbitration clause, that the misrepresentation was material, and that Rush justifiably relied on the misrepresentation. *See Mix v. Neff*, 99 A.D.2d 180, 473 N.Y.S.2d 31 (3rd Dep't 1984); *D'Angelo v. Bob Hastings Oldsmobile, Inc.*, 89 A.D.2d 785, 453 N.Y.S.2d 503 (4th Dep't 1982), *aff'd*, 59 N.Y.2d 773, 464 N.Y.S.2d 724, 451 N.E.2d 471 (1983); *Albany Motor Inn and Restaurant, Inc. v. Watkins*, 85 A.D.2d 797, 445 N.Y.S.2d 616 (3rd Dep't 1981); *see also* Restatement (2d) Contracts, §§ 159, 161, 162(2), 163, & 164.

In addition, to establish that Seskis had made fraudulent misstatements concerning the margin agreement, Rush was required to show that Seskis did not have the confidence that he stated or implied in the truth of his statements or that Seskis knew that he did not have the basis that he states or implies for the assertion. *See* Restatement (2d) Contracts, § 162.

7. Prima claimed that Flood & Conklin had fraudulently represented that it was solvent and able to perform its obligations, whereas it was insolvent and planned to file a bankruptcy petition shortly after executing the consulting agreement. *Prima Paint*, 388 U.S. at 398, 87 S.Ct. at 1803.

pass Prima Paint's claim that both execution and acceleration of the consulting agreement itself were procured by fraud. Indeed, no claim is made that Prima Paint ever intended that "legal" issues relating to the contract be excluded from arbitration, or that it was not entirely free so to contract.

*Prima Paint,* 388 U.S. at 406, 87 S.Ct. at 1807.

By expressly referring to Prima's failure to show that it had not intended "legal" issues relating to the making of the principal contract to be subject to arbitration, the Court implicitly adopted the Second Circuit's rationale that "arbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded, and that where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud." *Prima Paint,* 388 U.S. at 402, 87 S.Ct. at 1805. This rationale is consistent with the federal policy expressed in the Act in favor of the enforceability of arbitration agreements: "A written [arbitration] provision in ... a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

■ It follows logically from *Prima Paint* and § 4 of the Act that a court may order arbitration only when the party opposed to arbitration has not claimed that the arbitration agreement itself was fraudulently procured. Only when the arbitration agreement itself is valid does the Act instruct a federal court to order arbitration. To permit an arbitration panel to resolve a challenge to the validity of an arbitration agreement, whether or not accompanied by challenges to the underlying contract, would require a federal court to relinquish its jurisdiction, and its obligation, under § 4 of the Act to determine that "the making of the agreement for arbitration ... is not in issue."[8] Therefore, when as here allegations of fraud are directed at the contract as a whole and at the arbitration clause in particular, the federal court must resolve the preliminary issue of the validity of the arbitration agreement.

Neither the Act nor the Court's analysis in *Prima Paint* support the conclusion that the allegation of fraud must be directed exclusively at the arbitration clause and not at the overall contract. Indeed, the Court in *Prima Paint* explicitly noted that its decision was consistent with its holding in *Moseley v. Electronic & Missile Facilities, Inc.,* 374 U.S. 167, 83 S.Ct. 1815, 10 L.Ed.2d 818 (1963). *Prima Paint,* 388 U.S. at 404 n. 12, 87 S.Ct. at 1806 n. 12. In *Moseley,* the Court held that where allegations of fraud were directed at both the contract generally and the arbitration clause in particular, the district court must first resolve the issue of fraud with respect to the arbitration agreement. Only if that issue were determined favorably to the party seeking arbitration could the district court order arbitration of the remaining claims, including fraud with respect to the contract generally.[9] *Moseley,* 374 U.S. at 171, 83 S.Ct. at 1817.

8. Oppenheimer has not offered any rationale that would justify sending a case to an arbitrator when claims of fraud are directed at both the arbitration agreement and the principal agreement but not when the claim of fraud is directed only at the arbitration agreement. Indeed, the court cannot find the logic in the assumption that is implicit in such a result, namely, that a claim of fraud directed exclusively at the arbitration clause is inherently more deserving of federal adjudication than the identical claim of fraud accompanied by challenges to the principal agreement itself.

9. In *Moseley,* a prime contractor had inserted a clause into its subcontracts that provided for arbitration in New York. The arbitration clause nullified the subcontractor's rights under the Miller Act to sue on a contract in federal court in the district in which the contract was to be performed, which was Georgia. The subcontractor in *Moseley* had alleged

"that the subcontracts with him, as well as with other subcontractors, were a fraudulent scheme to obtain a great amount of work and material from him and the other subcontractors without payment therefor and to "browbeat" petitioner and his fellow subcontractors

Oppenheimer urges this court to adopt a view of *Prima Paint* that would permit a federal court to adjudicate a claim of fraud as to the making of an arbitration agreement only when the claim of fraud was directed specifically at the arbitration clause and not at the overall contract. In support of its position, Oppenheimer cites to a line of Supreme Court cases beginning with *Prima Paint* and continuing through the Court's recent opinion in *Shearson/American Express, Inc. v. McMahon,* that express a strong federal policy in favor of the liberal enforcement of arbitration agreements. *See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed. 2d 444 (1985); *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985); *Southland Corp. v. Keating,* 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed. 2d 1 (1984); *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). However, although these cases establish a strong federal policy in favor of arbitration agreements, there is nothing in the Supreme Court's opinions to suggest that, in furtherance of this policy of enforcement, federal courts should be less vigilant in their duty to ascertain whether a valid agreement to arbitrate *exists.*

*Scherk v. Alberto-Culver* involved a dispute that arose out of an agreement between an American company and a German citizen for the purchase of three companies organized under the laws of Germany and Liechtenstein, together with the trademark rights of those companies. In response to the American company's action in federal court alleging that the petitioner had made fraudulent representations concerning the trademark rights, the petitioner moved to stay the action pending arbitration pursuant to a clause in the sales contract which provided that any claims arising out of the

agreement or the breach thereof would be referred to arbitration before the International Chamber of Commerce in Paris. Finding that the arbitration clause was, in effect, a specialized kind of forum selection clause, *see The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), the Court held that under the Act, federal courts were required to enforce it. *Scherk,* 417 U.S. at 519–20, 94 S.Ct. at 2457. Because the respondent in *Scherk* did not allege fraud with respect to the arbitration clause itself, the Court's discussion of the *Prima Paint* issue was limited to a footnote observation that "an arbitration or forum-selection clause in a contract is not enforceable if the *inclusion of that clause in the contract* was the product of fraud or coercion." *Scherk,* 417 U.S. at 519 n. 14, 94 S.Ct. at 2457 n. 14. The Court's observation supports the rationale, discussed above, that any claim of fraud directed at the arbitration clause itself is not an appropriate issue for arbitration, regardless of whether it is accompanied by allegations of fraud aimed at the overall contract.

In *Moses H. Cone Hospital v. Mercury Constr. Corp.,* the party that had drafted the principal agreement, which contained an arbitration provision, sought to avoid its terms by filing a declaratory judgment action in state court. No claim having been made that the principal contract, let alone the arbitration clause, was procured through fraud, the Supreme Court affirmed the Fourth Circuit's order compelling arbitration of the parties' underlying dispute, notwithstanding the fact that state court proceedings on the underlying dispute were already pending. *Moses H. Cone Hospital,* 460 U.S. at 29, 103 S.Ct. at 943. The Court cited *Prima Paint* merely as support for the strong federal policy in favor of arbitration agreements. *Id.* at 24–25, 103 S.Ct. at 941; *see also Southland Corp. v. Keating,* 465 U.S. at 11, 104

---

into accepting much less than the value of their claims. One of the means used to effect such a scheme was alleged to be the insertion in the subcontracts of an arbitration clause requiring arbitration of disputes in New York."

*Moseley,* 374 U.S. at 171, 83 S.Ct. at 1817. The Court found that the petitioner had sufficiently alleged fraud as to the arbitration agreement itself to require the federal court to address that issue, even though the petitioner had also alleged fraud as to the overall agreement.

S.Ct. at 858 (federal policy behind Federal Arbitration Act equally enforceable in state court and thus preempts contrary state statute). There is nothing in the Supreme Court's opinions in *Moses H. Cone* or in *Southland* to suggest that when the allegation of misstatement or fraud is directed at the entire agreement, a challenge to the arbitration clause itself must also be determined by the arbitrator. In recent opinions upholding arbitration agreements, the Supreme Court has added to its general endorsement of arbitration agreements the *caveat* that federal "courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.' 9 U.S.C. § 2." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. at 627, 105 S.Ct. at 3354; *see Shearson/American Express v. McMahon*, 107 S.Ct. at 2337.

The federal policy in favor of arbitration agreements has provided the foundation for the Court's recent expansion of the types of claims that they may encompass. *See, e.g., Mitsubishi Motors*, 473 U.S. at 629, 105 S.Ct. at 3355 (antitrust claim

against foreign company); *Shearson/American Express*, 107 S.Ct. at 2343 (§ 10(b) claims under the '34 Act), 2346 (RICO claims). However, this broadening of the scope of arbitrable claims only underscores the necessity for federal courts to determine that the making of the arbitration agreement is not in issue before sending the parties to arbitration. A federal court's obligation to resolve issues as to the making of an agreement to arbitrate is a particularly important safeguard in cases involving the kind of customer account agreements used in the securities industry. In such cases the agreement to arbitrate is commonly no more than one of many fine-printed clauses in the broker's form contract. Normally, customer agreements for trading in securities do not contain a separate signature line that requires the customer's explicit assent to arbitration, as is required by law for customer agreements under the Commodity Exchange Act.[10]

■ Unlike arbitration provisions in such other commercial contracts as asset purchase agreements, distribution agreements, licensing agreements, and joint venture agreements, the agreement to arbitrate contained in a securities account agreement

---

10. Pursuant to §§ 5a(11), 17(b)(10) and 8a(5) of the Commodity Exchange Act, 7 U.S.C. §§ 7a(11), 12a(5) and 21(b)(10), the Commodity Futures Trading Commission has promulgated regulations to ensure that a customer voluntarily elects to submit to arbitration claims he may have in the future against his broker. 17 C.F.R. § 180.3 provides, in part:

(b) No futures commission merchant, introducing broker, floor broker, commodity pool operator, commodity trading advisor, or associated person shall enter into any agreement or understanding with a customer in which the customer agrees, prior to the time the claim or grievance arises, to submit such claim or grievance to any settlement procedure except as follows:

(1) Signing the agreement must not be made a condition for the customer to utilize the services offered by the futures commission merchant, introducing broker, floor broker, commodity pool operator, commodity trading advisor or associated person.

(2) If the agreement is contained as a clause or clauses of a broader agreement, the customer must separately endorse the clause or clauses containing the cautionary language and other provisions specified in this section;
. . .

(6) The agreement must include the following language printed in large boldface type:
THREE FORUMS EXIST FOR THE RESOLUTION OF COMMODITY DISPUTES: CIVIL COURT LITIGATION, REPARATIONS AT THE COMMODITY FUTURES TRADING COMMISSION (CFTC) AND ARBITRATION CONDUCTED BY A SELF-REGULATORY OR OTHER PRIVATE ORGANIZATION.

THE CFTC RECOGNIZES THAT THE OPPORTUNITY TO SETTLE DISPUTES BY ARBITRATION MAY IN SOME CASES PROVIDE MANY BENEFITS TO CUSTOMERS, INCLUDING THE ABILITY TO OBTAIN AN EXPEDITIOUS AND FINAL RESOLUTION OF DISPUTES WITHOUT INCURRING SUBSTANTIAL COSTS. THE CFTC REQUIRES, HOWEVER, THAT EACH CUSTOMER INDIVIDUALLY EXAMINE THE RELATIVE MERITS OF ARBITRATION AND THAT YOUR CONSENT TO THIS ARBITRATION AGREEMENT BE VOLUNTARY.

BY SIGNING THIS AGREEMENT, YOU: (1) MAY BE WAIVING YOUR RIGHT TO SUE IN A COURT OF LAW; AND (2) ARE AGREEING TO BE BOUND BY ARBITRATION OF ANY CLAIMS OR COUNTERCLAIMS WHICH YOU OR [NAME] MAY SUBMIT TO ARBITRATION UNDER THIS AGREEMENT....

has not been negotiated between the customer and the broker and cannot reasonably be deemed to represent a *quid pro quo* exchange between two parties. Moreover, brokers are not required as a matter of law to disclose or explain arbitration clauses to the customer. *See Pierson v. Dean, Witter Reynolds, Inc.*, 742 F.2d 334, 339 (7th Cir.1984); *Rush v. Oppenheimer,* 638 F.Supp. 872 (S.D.N.Y.1986); *Adams v. Merrill Lynch, Pierce, Fenner & Smith,* [1985–1986 Tr.Br.] (CCH) Fed.Sec.L.Rep. ¶ 92,328 (W.D.Okla. Sept. 20, 1985) [Available on WESTLAW, 1985 WL 5813]; *Pelzman v. Paine, Webber, Jackson & Curtis, Inc.*, [1983–1984 Tr.Br.] (CCH) Fed. Sec.L.Rep. ¶ 99,408 (D.D.C.1983) [Available on WESTLAW, 1983 WL 1338].

In support of its reading of *Prima Paint* in general and its application to the facts of this case in particular, Oppenheimer has cited to decisions from other circuits in which courts have ordered arbitration where the plaintiff's claim of fraudulent inducement pertained to the principal agreement and not *solely* to the arbitration clause contained therein. Each of these cases rests on an interpretation of the Supreme Court's decision in *Prima Paint* that, as set forth at length above, reaches beyond its holding. For example, in *Schacht v. Beacon Ins. Co.*, 742 F.2d 386 (7th Cir.1984), the appellant claimed that the appellee had fraudulently induced it to enter into a reinsurance agreement by orally promising to pay an advance premium. The appellant alleged that the fraudulent representation went to the arbitration agreement as well as to the entire agreement. In rejecting the appellant's attempt to avoid arbitration, the Seventh Circuit stated,

> Appellant nowhere contends that the alleged fraud in the inducement applied *solely* to the arbitration clause. Its claim of fraud applies equally to all provisions of the contract. Thus, if the clause is sufficiently broad to encompass a claim of fraud in the inducement, the district court properly concluded that *Prima Paint* precludes the court from addressing that claim.

*Schacht v. Beacon Ins. Co.*, 742 F.2d at 389–90. In its opinion, the Court did not consider the distinction between fraud claims that can reasonably be found to relate to both the principal agreement and the arbitration agreement itself and fraud claims that pertain only to the principal contract. Thus, the Court's overbroad application of *Prima Paint* prevented it from addressing the merits of appellant's claim of fraud with respect to the arbitration agreement itself. The Courts of Appeals for the Fifth, Sixth and Eleventh Circuits have similarly adopted a broad reading of *Prima Paint* in sending to the arbitrator claims of fraud that arguably went to both the principal agreement in general and the arbitration clause in particular. *See, e.g., Bitkowski v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 833 F.2d 1011 (6th Cir.1987); *Bhatia v. Johnston*, 818 F.2d 418 (5th Cir.1987); *Driscoll v. Smith Barney, Harris, Upham & Co.*, 815 F.2d 655 (11th Cir.1987); *Coleman v. Prudential Bache Securities, Inc.*, 802 F.2d 1350 (11th Cir.1986).

Because the decisions to order arbitration in these cases are not based on an analysis of the Act or *Prima Paint* and its progeny, however, they provide little guidance as to what this Circuit might hold were it confronted with the issue of whether a federal court should resolve allegations of fraud based on statements that obviously relate to the principal agreement but that are alleged, as here, to be fraudulent with respect to the arbitration agreement. Although there are no decisions from this Circuit that are directly in point, in the cases in which the Circuit has followed *Prima Paint* and ordered arbitration, the Circuit has been careful to point out that the party objecting to arbitration had not alleged that the arbitration agreement itself was induced by illegality or fraud. *See Hamilton Life Ins. Co. v. Republic National Life Ins. Co.*, 408 F.2d 606, 610 (2d Cir.1969); *Trafalgar Shipping Co. v. International Milling Co.*, 401 F.2d 568, 572 (2d Cir.1968). Thus, these Second Circuit cases are consistent with *Prima Paint*, which did not involve allegations of fraud with respect to the arbitration agree-

ment. These cases do not, however, suggest that the Circuit might be inclined to order arbitration where a party has alleged that certain statements that were made in connection with the signing of a contract were false as to the arbitration provision in particular. *See also Maria Victoria Naviera, S.A. v. Cementos Del Valle*, 759 F.2d 1027, 1031 (2d Cir.1985) ("In an action to compel arbitration, the function of the court is limited to determining whether there is an agreement to arbitrate the underlying dispute ..."). *But cf. Jarvis v. Dean Witter Reynolds, Inc.*, 614 F.Supp. 1146 (D.Vt.1985).

The lack of federal regulations concerning the making of agreements to arbitrate, such as those promulgated under the Commodity Exchange Act, leaves the courts solely responsible for reviewing the validity of the making of such agreements under general principles of contract law. Under these circumstances, the relief that *Prima Paint* and the Act provide investors from the fraudulent procurement of their assent to arbitration would be illusory if the federal court did not retain jurisdiction over claims that statements pertaining to the underlying agreement were fraudulent with respect to the arbitration agreement. Thus, *Prima Paint* requires a federal court to resolve allegations of fraud that pertain to both the principal agreement as a whole and the arbitration agreement in particular.

*Rush Failed to Establish a Prima Facie Claim of Fraud as to the Making of the Agreement to Arbitrate*

Whether a given allegation can give rise to a prima facie claim of fraud with respect to the making of an arbitration agreement is a matter for the court to decide.[11] As

this case demonstrates, this issue can be fraught with ambiguity. On the one hand, if, for example, the claim were that Seskis had induced Rush to sign the margin agreement by falsely saying that most investors earn a 50% annual return on their investments with Oppenheimer, then although Rush might have a claim of fraudulent inducement as to the overall agreement, he could not claim that the statement was false as to the arbitration clause in particular. On the other hand, if the claim were that Seskis had told Rush there was no need to read the agreement since he, Rush, would not be signing away any constitutional rights, then Rush would have a colorable claim of fraud with respect to the making of the arbitration agreement itself.

■ In the instant case, Rush contends that he was fraudulently induced to agree to arbitration when his broker told him to sign without reading a margin agreement that contained an arbitration clause. Rush testified on both direct and cross-examination that at a meeting at Oppenheimer's offices with Seskis, Seskis handed him some documents that he was required to sign before opening an account at Oppenheimer. Rush testified that Seskis told him "there was no need to read [the documents], that they were just a formality and they were just like the documents at Drexel." Trial Transcript ("TT") at 59.[12] Rush contended at trial that these statements related to and were misleading as to the arbitration clause in particular. However, on the evidence adduced at trial, Rush failed to establish a prima facie claim of fraud in connection with the making of the agreement to arbitrate.

11. If the court is to proceed under the assumption that arbitration clauses are "separable" from the rest of the agreement, *see Prima Paint*, 388 U.S. at 402, 87 S.Ct. at 1805, the court must consider whether a given statement could be deemed to pertain to, and be fraudulent with respect to, the arbitration clause separately.

12. On cross-examination, Rush testified as follows:
    Question: You were told not to read [the document]?
    Rush: Yes.

Q: When were you told not to read it?
Rush: I started to look at it.
Q: And what were the words that were spoken?
Rush: "There is no need to read it. It's just a formality. It's the same as at Drexel."
Q: "No need to read it." He didn't say stop reading, did he?
Rush: No, he didn't.
TT at 125. Seskis testified that he had told Rush to read the forms. TT at 175.

First, there is no evidence in the record to support the jury's conclusion that Seskis's statements were false as to the arbitration clause contained in the Oppenheimer margin agreement. Oppenheimer contends, correctly, that there was no evidence to support the jury's conclusion that Seskis's statement that the documents were "just a formality and just like the documents at Drexel" were false as to the arbitration clause.

The evidence adduced at trial indicated that both the customer account agreement Rush had signed at Drexel and the margin agreement he signed at Oppenheimer contained arbitration clauses. That the Oppenheimer agreement provided for arbitration before the New York Stock Exchange ("NYSE") or the National Association of securities Dealers whereas the Drexel arbitration clause provided a choice of either the American Arbitration Association or the NYSE did not create a material difference between the two clauses.[13] Moreover, because the facts also showed that Rush had already decided to transfer his account at Drexel to Oppenheimer so as to keep it with Seskis and that executing a customer agreement was a prerequisite to accomplishing that transfer, there was no contrary evidence to show that either Rush or Seskis considered signing the agreements to be anything other than a "formality."

The jury's finding that Seskis had told Rush that he did not need to read the margin agreement creates a closer issue with respect to the arbitration clause. Under a different set of facts, it would not be wholly unreasonable for a jury to find falsity where a broker has told a customer that the latter need not read a contract that contained a waiver of a constitutional right. Here, however, Rush testified that he had signed two Drexel customer account agreements when Seskis was at Drexel, and both contained arbitration clauses. Although Rush claimed that he had not read the

Drexel arbitration clauses when he signed the Drexel agreements, he testified that he had never posed an objection to the Drexel agreements or the arbitration clauses contained therein. The facts established that both Seskis and Rush viewed the actual execution of the documents required to transfer Rush's account to Oppenheimer, as previously agreed, as a formality in an otherwise uninterrupted relationship that had arisen at Drexel. In addition, the evidence showed that the arbitration clauses in the Drexel and Oppenheimer agreements were substantially the same. Under this set of facts, therefore, there was no reasonable basis for the jury's conclusion that Seskis's "no-need-to-read" statement was false or misleading as to the arbitration clause itself.

The lack of evidence to support the jury's decision as to the falsity of Seskis's statements is a sufficient basis for overturning the verdict. However, even if one were to assume *arguendo* that there was a sufficient factual basis for the jury's finding on falsity, the insufficiency of the evidence as to both materiality and justifiable reliance provides adequate alternate grounds for setting aside the verdict. As for materiality, Rush was required to show that Seskis's statements would have been reasonably likely to induce a reasonable person to manifest his assent to the margin agreement. Further, Rush had to establish that Seskis's statements, which allegedly kept him from reading the margin agreement and discovering the arbitration clause, were a substantial factor in causing him to sign the margin agreement.

The evidence showed, however, that less than one year prior to the time he executed the Oppenheimer agreements, Rush had freely executed, without objection, customer account agreements at Drexel that contained similar arbitration provisions. Thus, the proof showed that the inclusion of an arbitration clause in a customer account

**13.** In *Shearson/American Express v. McMahon*, 107 S.Ct. at 2341, the Court stated, "In the exercise of its regulatory authority, the SEC has specifically approved the arbitration procedures of the New York Stock Exchange, the American Stock Exchange, and the National Association of Securities Dealers." Neither the SEC nor the Supreme Court have qualified their endorsement of arbitration agreements by recommending that arbitration not be conducted under the auspices of an organization of which the brokerage firm is a member.

agreement had not previously deterred Rush from signing the agreement. There was no reasonable basis for the jury to conclude otherwise with respect to the Oppenheimer agreement.

Rush also testified that he would not have entered into the Oppenheimer margin agreement if he had known that the arbitration clause might require him to pursue his claims before a tribunal of which Oppenheimer was a member, namely the NYSE. There was, however, no evidentiary support for this claim. On the contrary, Rush testified that he had not been aware of arbitration as an alternate form of dispute resolution prior to its appearance as an issue in this litigation. Thus, only through "sheer surmise and conjecture" could the jury conclude that if he had read the arbitration clause Rush would have decided not to sign the margin agreement.

Finally, Rush failed to establish that he justifiably relied on Seskis's statements in signing the margin agreement without reading it and without objecting to the arbitration clause contained therein. The lack of proof of materiality underscores the absence of proof as to Rush's reliance; that is, there was no evidence that if he had read the arbitration clause, he would not have signed the margin agreement and thereby committed himself to arbitration. Moreover, Rush did not offer into evidence any facts from which the jury could have inferred that Rush was justified in relying on Seskis's statements. As the jury was instructed, Rush's reliance on Seskis's statements would not have been justified if he could have discovered the falsity of the statement by a cursory examination. Rush testified that only he and Seskis were present in the conference room when he signed the margin agreement. Rush also testified that, although Seskis told him he did not need to read the document, he was not physically prevented from reading the two page document that he held in his hands.

Rush explained his failure to read the document on the grounds that he did not want to appear to be questioning "Seskis's trust, trustworthiness or truthfulness." TT at 67. However, Rush did not produce evidence to establish that a confidential, fiduciary or trusting relationship existed between him and Seskis. On the contrary, Rush testified that he had signed a similar agreement containing a similar arbitration clause the very first time he met Seskis. As the Seventh Circuit stated in *Fey v. Walston & Co., Inc.,* 493 F.2d 1036, 1049 (7th Cir.1974), the "mere existence of a broker-customer relationship is not proof of its fiduciary character...." The fiduciary obligation that arises between a broker and a customer as a matter of New York common law is limited to matters relevant to affairs entrusted to the broker. *Schenck v. Bear, Stearns & Co.,* 484 F.Supp. 937, 946–48 (S.D.N.Y.1979). There was no evidence from which the jury could infer that Rush had placed his trust in Seskis with respect to any matters beyond the individual transactions in his account.

In sum, there was no evidence to support the jury's verdict on the issues of falsity, materiality and justifiable reliance. Rush failed to establish a prima facie case of fraudulent inducement with respect to the making of the agreement to arbitrate. For the reasons set forth above, Oppenheimer's motion for judgment n.o.v. is granted, and judgment will be entered dismissing the complaint and directing the parties to arbitrate.

The parties are directed to submit judgment on notice within ten (10) days.

IT IS SO ORDERED.