Donald PRESS, on behalf of himself
and all others similarly
situated, Plaintiff,

v.

CHEMICAL INVESTMENT SERVICES
CORP., Chase Manhattan Corporation,
Pershing, a Corporate Division of Don-
aldson, Lufkin & Jenrette Securities
Corporation, and Donaldson, Lufkin &
Jenrette Securities Corporation, Defen-
dants.

No. 96 Civ. 8331(DLC).

United States District Court,
S.D. New York.

Dec. 22, 1997.

Alice McInerney, Andrea Bierstein, Kaufman, Malchman, Kirby & Squire, L.L.P., New York NY, for Plaintiff Donald Press.

Ahuva Genack, Matthew G. Leonard, Chase Manhattan Legal Department, New York, NY, for Defendants Chemical Investment Services Corp. and Chase Manhattan Corporation.

Stephen L. Ratner, Joseph Zuckerman, Rosenman & Colin, L.L.P., New York City,

for defendants Pershing and Donaldson, Lufkin & Jenrette Securities Corporation.

## OPINION and ORDER

COTE, District Judge.

Plaintiff Donald Press ("Press") first filed this putative class action on November 6, 1996, and filed an Amended Complaint on February 24, 1997, alleging that the defendant securities brokerage firms (and their respective corporate parents) violated Section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b); Rules 10b–5 and 10b–10 promulgated thereunder, 17 C .F.R. §§ 240.10b–5 and 240.10b–10; Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a); and New York State common law of conversion, unjust enrichment, and breach of fiduciary duty. Press alleges that he and the members of the putative class purchased U.S. Treasury securities through the defendants and were injured in one or more of the following ways: (a) they were assessed undisclosed charges, commissions, or markups on their purchases; (b) they received trade confirmation forms that incorrectly stated the yield or maturity for the securities, or incorrectly described the defendants' capacity in effectuating the trade; and (c) they were denied prompt access to their trade proceeds by the defendants, who improperly retained the proceeds after maturity and profited from them.

On December 11, 1996, the Court signed a stipulated order granting the defendants until January 9, 1997, to make a motion with respect to the original complaint, and at least one of the defendants served such a motion. At a conference on January 31, 1997, the Court expressly questioned Press as to whether in light of that motion he wished to amend the complaint to cure any defects; the Court directed that any such amendment be filed by a deadline that through mutual consent of the parties was set at February 24, 1997, on which date Press did in fact file the present, Amended Complaint.

The defendants have now moved to dismiss the Amended Complaint (hereinafter "Complaint") for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), Fed.R.Civ.P., and for failure to plead fraud with particularity, pursuant to Rule 9(b), Fed.R.Civ.P. For the reasons set forth below, the defendants' motion is granted in full, and Press's federal claims are dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Press's state law claims under 28 U.S.C. § 1367(c), and therefore dismisses those claims without prejudice.

## STANDARD OF REVIEW

This Court may dismiss an action pursuant to Rule 12(b)(6) only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)). In considering a motion to dismiss, the Court must take "as true the facts alleged in the complaint and draw[ ] all reasonable inferences in the plaintiff[s'] favor." *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 699–700 (2d Cir.1994). In other words, the Court can dismiss Press's Complaint only if, assuming all facts as true, he still has failed to plead the basic elements of his causes of action.

## BACKGROUND

Press's action is based on a single transaction: on November 10, 1995, he purchased a six-month U.S. Treasury bill worth roughly $100,000 from defendant Chemical Investment Services Corp. ("Chemical"), a wholly-owned subsidiary of defendant Chase Manhattan Corporation ("Chase"). The trade was cleared through defendant Pershing, a corporate division of defendant Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ"), both of which are registered securities broker-dealers like Chemical. Press alleges that when he telephoned Chemical to place an order for a Treasury bill in the $100,000 range, he spoke to an employee of Chemical named Ira Green, "who had, on at least one prior occasion, facilitated [Press's] purchase of a Treasury bill through defendants." Green advised Press that for $99,488.42 he could purchase a Treasury bill that

would mature in six months at $102,000; in other words, for $99,488.42 Press could buy the right to obtain $2,511.58 in six months' time. Press agreed to the transaction, met Green at Chemical's premises, wrote out a check in the appropriate amount to Pershing, and received an Investment Receipt from Chemical.

A few days later, Press received a trade confirmation form issued jointly by Chemical and Pershing, whose names and addresses were listed at the top of the document. The form confirmed that on November 10, 1995, Press had purchased a six-month Treasury bill that was set to mature at $102,000 on May 9, 1996. The form also provided two different calculations of the yield on the transaction; what Press describes as the "discount yield" ("DISC") was listed as 4.980, and what he terms the "bond equivalent yield" ("YLD ... TO MAT") was listed as 5.177. Ira Green was named on the form as Press's "Investment Consultant," and the form further indicated that the "Trade Date" and "Process Date" for the transaction were November 10, 1995, and that the "Settlement Date" was November 13, 1995. A bold-type message noted that the form was "**AN AD-VICE NOT AN INVOICE. REMIT-TANCE OR SECURITIES ARE DUE ON OR BEFORE** *SETTLEMENT DATE***."** (Emphasis added.) Finally, under a box marked "MKT/CPTY"—for "Market" and "Capacity"—the form listed "4/5" without further immediate explanation. But a legend printed in bold on the bottom of the form stated: "**SEE REVERSE SIDE FOR TERMS AND CONDITIONS AND EX-PLANATION OF CODED SYMBOLS RE-LATING TO THIS CONFIRMATION.**" The reverse side of the form indicated that a

"Market" figure of "4" represented the "Over the Counter" market, and that a "Capacity" listing of "5" meant that the "Capacity in Which Your Introducing Firm Acted" was "*as principal.*"[1] (Emphasis added.)

In early May 1996, shortly before the maturity date for his Treasury bill, Press contacted Chemical and indicated his desire to receive the proceeds of the transaction on the maturity date, May 9. He was informed by Mr. Green and others that Chemical's standard operating procedures would not permit receipt of the proceeds on that date; rather, Chemical would either post a check to him on the maturity date by regular mail, send the check to him one day after maturity by overnight courier (for arrival two days after maturity), or wire the proceeds directly to him one day after maturity. Press was told that he could not pick up the check in person at Chemical's headquarters (or any other location in New York City) on the maturity date, and subsequently learned that receipt of the proceeds by wire or overnight courier would entail a charge of $15 to $20. Press eventually received a check for the matured proceeds four days—which included a weekend—after the maturity date, and in an amount $15 dollars less than the stated maturity value of $102,000. According to Press, he was advised by Chemical that this deficiency represents a Federal Express or similar courier charge.

## DISCUSSION

Press's claims fall into three broad categories corresponding to (a) the "markup" he paid in purchasing the security through the defendants, (b) the yield figures reported on his trade confirmation form, and (c) the delay

---

1. A copy of the front side of the confirmation form was attached as an exhibit to Press's Complaint and therefore may be considered by the Court on this motion to dismiss without converting the motion to one for summary judgment. *See* Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). Although Press did not attach to the Complaint a copy of the reverse side of the confirmation form, that document is also referenced in the Complaint and is discussed at length by both parties in their motion papers. For these reasons, as well as the fact that the front side of the form plainly advises

readers to "**SEE REVERSE SIDE**" for additional explanatory information, the reverse side of the form is integral to the Complaint and therefore will also be considered by the Court on this motion to dismiss. *See, e.g., International Audiotext Network, Inc. v. AT & T,* 62 F.3d 69, 72 (2d Cir.1995) (where plaintiff elects not to attach or incorporate by reference document that is integral to complaint and on which it relies, court may nevertheless take document into consideration in deciding motion to dismiss without converting it to one for summary judgment) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991)).

he experienced in receiving the trade proceeds. It will be helpful to describe each in some detail before explaining why none presents a viable claim under federal securities law.

First, as to the markup, Press's complaint is that the price he was charged for the Treasury bill was "significantly greater" than the price the defendants paid to obtain the bill in the first instance, and that he was never advised by the defendants—either before entering into the trade or upon receipt of his post-trade confirmation—that he was being assessed this "undisclosed commission and/or markup." Press essentially agrees that the amount of the "markup" was $158.86,[2] or the difference between the $99,-329.56 price that the defendants paid for the Treasury bill and the $99,488.42 that they charged Press for the trade. He contends that this markup is "excessive," totaling more than 6% of the $2,511 *yield* realized on the transaction, and 1/6 of a percent of the bill's *overall price,* a figure that he describes as "approximately 5 times the industry standard of a spread of a 1/32 of a percentage point." Press concedes that brokers such as the defendants routinely charge higher markups when they act as "principals" in a transaction, *i.e.,* for their own account, but he asserts that he was never told "prior to tendering payment" that the defendants were not "acting as *his agents* in this transaction," nor was he advised of the "material differences between defendants acting as agents or principals." (Emphasis added .)

Second, although Press's yield claim is somewhat opaque, the crux of his allegation is that his trade confirmation form misrepresented the actual yield that he received on his Treasury bill transaction. Specifically, Press asserts that although *181* days elapsed between the November 10, 1995 *"Trade Date"* (when he purchased the security) and the May 9, 1996 maturity date, the 5.177 yield figure reported on his confirmation form was based on a *178* day time span,

corresponding to the period between the November 13, 1995 *"Settlement Date"* and the maturity date. According to Press, because his security actually matured over 181 days, the form was incorrect in indicating that the $2,511 he received was based on a yield figure of 5.177; he contends that a lower figure should have been reported,[3] inasmuch as he was never informed that the yield calculations were "not from the date of his trade."

Finally, with respect to his delayed access to the proceeds of the transaction, Press alleges that "[a]t the time of the purchase, [he] expected and relied upon the fact that the bill would mature on May 9, 1996, and he would be able to receive the matured proceeds on that date." Such prompt receipt is necessary, he asserts, to enable investors to "obtain and reinvest the proceeds as soon as possible after maturity to maximize [their] profit"; conversely, a broker's "prolonged retention of the bill following maturity allows the broker to profit at the customer's expense," and "necessarily diminishes a customer's possible profit from the transaction." Despite the importance of early access to proceeds, Press claims that he never was informed, either upon entering into the transaction or receiving his confirmation form, that he would not receive the proceeds on the maturity date.

While Press organizes these allegations into claims under Rule 10b–10 and under Section 10(b) and Rule 10b–5, the same three basic contentions remain. As to all three Press asserts that the defendants acted as "his fiduciaries with respect to [the Treasury bill] transaction," and that their conduct was "willful, wanton, and malicious." He also alleges fraud with respect to each claim, *i.e.,* that the defendants "knowingly or recklessly" made "materially false and misleading statements" or "failed to disclose material facts" to himself and members of the putative class, and that the defendants "intended to

---

2. The Complaint alleges that Federal Reserve records show the base value of the bill to have been $99,272.52, so that the price Press was charged constitutes a "spread" of over $200 above the bill's original price.

3. Press argues in opposing this motion that if the return on his investment is calculated over a *183* day period—the time between his purchase and the first date after maturity that he could have had access to the proceeds—the yield figure on his $2,511 profit drops even further.

deceive" the class and acted with "reckless disregard for the truth."

## A. *Claims Under Rule 10b–10*

Rule 10b–10 prescribes the "specified information" that broker-dealers are required to disclose to customers in a written confirmation form "at or before completion of a transaction." *See* 17 C.F.R. § 240.10b–10, Preliminary Note. As the parties generally concur, the information relevant to Press's claims that must be provided includes:

(1) the date and time of the transaction, and the identity, price, and number of shares of the security that were purchased, *id.* § 240.10b–10(a)(1);

(2) whether the broker or dealer is acting "as agent" for the customer (and/or some other person), or "as principal for its own account"; and if the latter, whether the broker or dealer is a market maker in the security, *id.* § 240.10b–10(a)(2);

(3) the "dollar price at which the transaction was effected" and the "yield to maturity calculated from the dollar price," to the extent that the transaction was "effected exclusively on the basis of a dollar price," *id.* § 240.10b–10(a)(5); and,

(4) the "yield at which the transaction was effected, including the percentage amount and its characterization (*e.g.,* current yield, yield to maturity, or yield to call)," along with the "dollar price calculated from the yield at which the transaction was effected," to the extent that the transaction was "effected on the basis of yield," *id.* § 240.10b–10(a)(6).

Press alleges that the defendants violated these provisions of Rule 10b–10 by misstating or failing to disclose in their confirmation forms:

(a) the true capacity in which the defendants are acting; (b) the true yield figures;

(c) the amount of the mark-up or other remuneration defendants receive in connection with class members' transactions; and (d) the date upon which the proceeds of the matured Treasury securities will be delivered to class members.

None of these allegations has merit or states a claim under Rule 10b–10.

█ First, Press is flatly incorrect that the confirmation fails to disclose the defendants' "capacity" in effecting his trade; to the contrary, the box on the front of the form indicating capacity ("CPTY") plainly lists the figure "5", and the reverse side of the form explains that such a designation means that Press's "Introducing Firm" was functioning as "principal" for purposes of that transaction. It is evident that Chemical is the introducing firm referenced in that notation because, in addition to the fact that Chemical was the only entity that Press dealt with in executing this retail transaction, the front of the form states (in part in bold) "Clearing Through **PERSHING,** Division of [DLJ]," thus making clear that Pershing—the only other entity involved—was the "*clearing broker*" for the transaction, a fact that Press in any event concedes in his Complaint.[4]

█ Press appears to assert in the alternative, though his Complaint and opposing papers are not entirely clear, that the confirmation form *misrepresented* the defendants' capacity in his Treasury bill transaction. He alleges that Chemical in fact "acted as [his] agent" with respect to that transaction, "notwithstanding the conclusory coded notation on [his] confirmation" form to the contrary. Ostensibly, Press's theory of liability here is predicated on the requirement under Rule 10b–10 that brokers acting as agents disclose the amount of "any remuneration" received on a trade[5]—which Press argues includes markups—and the fact that the confirmation form in this case provided no such information as to the markup admittedly taken by the defendants. But Press's theory, on

---

4. The Complaint states that "at all times relevant hereto, Pershing acted as the clearing broker for defendant Chemical Investment."

5. Rule 10b–10 requires brokers or dealers acting "as agent" to disclose the "source and amount of

any ... remuneration received or to be received by the broker," whether from the customer or otherwise, "in connection with the transaction" at issue. *See* 17 C.F.R. § 240.10b–10(a)(2)(i).

which his capacity and markup claims under Rule 10b–10 both depend, is fatally defective to the extent that it depends on the existence of an agency relationship.

The Complaint contains only a conclusory assertion that Chemical acted "as agent," with no factual allegations to support that claim. Specifically, Press makes no allegation that any of the people he dealt with at Chemical (or anyone at Pershing) ever made an affirmative representation to the effect that they were acting as his agent, and not as principal, for purposes of his Treasury bill transaction. Instead, Press relies on the defendants' silence as to their roles, alleging that "[a]t no time prior to tendering payment, was [he] informed ... that defendants were purportedly not acting as his agents in this transaction." Nevertheless, given the Court's decision to consider the confirmation form in full on this motion to dismiss, *see supra* Note 1, the Court need not accept as true the conclusory allegations in the Complaint—to the extent that they assert an agency relationship—that are plainly contradicted by that form. *See, e.g., Feick v. Fleener*, 653 F.2d 69, 75 & n. 4 (2d Cir.1981) (affirming dismissal of claim based on powers of attorney that were attached to complaint and incorporated therein under Rule 10(c), Fed.R.Civ.P., where powers of attorney could not be construed as suggested in complaint and thus "show[ed] on their face absence of any grounds for relief"). Thus, when the Complaint is read as a whole, including the confirmation form, the only fair construction of its allegations is that Chemical acted as a principal in this transaction, a conclusion that negates Press's capacity claim as well as his markup claim.[6]

■ Press argues in opposing this motion that Chemical acted as his agent because it purchased the Treasury bill from a third party and resold the bill to him. But Press provides absolutely no authority for this novel interpretation of securities trading mechanics and nomenclature, and therefore this contention as to the defendants' capacity (and failure to disclose their markup) is likewise properly rejected.

■ Press's claim regarding yield is meritless as well. It is undisputed that the confirmation form correctly states the yield figure, 5.177, corresponding to Press's expected return, $2,511, based on the 178 day period between the November 13, 1995 "Settlement Date" of the trade and the May 9, 1996 maturity date. Press is left with the claim that the yield reported on the form is incorrect, and overstated, because the figure should have been based on the 181 day period between the November 10, 1995 "Trade Date" and the maturity date. Once again, however, Press furnishes absolutely no support for the core proposition on which his claim depends, *i.e.*, that the "Trade Date" governs in this situation and that the yield figure should have been based on that date as opposed to the "Settlement Date." More specifically, Press adduces no authority for the notion that yield in the securities industry is measured from any point *other than* the settlement date, which, as his confirmation form made clear, was the date that "REMITTANCE ... [WAS] DUE" ultimately on his Treasury bill transaction. Given that Press was not required to pay for the bill prior to the settlement date, and therefore that settlement marked the last date by which he could make payment and still effect the transaction, his claim that yield should instead be tied to the trade date makes little sense.[7]

---

6. It is essentially undisputed that Chemical, if a principal, had no obligation *under Rule 10b–10* to disclose any markup "or other remuneration" it received on Press's trade. Simply put, the plain language of the Rule requires no such information to be reported on a confirmation form where the broker or dealer acts as a "principal for its own account." 17 C.F.R. § 240.10b–10(a). Similarly, Rule 10b–10 imposed no obligation on the defendants to report on the confirmation form the date when Press's proceeds would be delivered, *see id.*, and his claim to that effect therefore also fails.

7. Because an investor cannot logically be entitled to the yield on an instrument prior to the date by which he actually transfers funds to his broker and gains ownership of the instrument, it would be unworkable to calculate yield by a date other than settlement, inasmuch as it is the investor who controls when he makes payment to the broker and whether he will do so at any time prior to the last viable one. In this vein, the use of the settlement date as the industry standard for the calculation of yield is perhaps the only

383

As to Press's assertions that the confirmation form "did not explain how the yield calculations were made" or "that the yield calculations are based on the [November 13, 1995] date," the short answer is that the defendants had no obligation *under Rule 10b–10* to provide such information on their form. Because the form accurately displayed the yield figure for the period from settlement to maturity, the Court cannot perceive a viable claim under Rule 10b–10 solely on the basis of Press's bald assertion that, "absent disclosure to the contrary, a reasonable person would likely assume that the 'trade date' controls." In sum, none of Press's allegations states a claim under Rule 10b–10 for misrepresentations or omissions on his confirmation form.[8]

**B.** *Claims Under Section 10(b) and Rule 10b–5*

■ Section 10(b) and Rule 10b–5 prohibit fraudulent activities in connection with the purchase or sale of securities.[9] In order to state a cause of action under Rule 10b–5, a plaintiff must allege that,

in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information

and that plaintiff's reliance on defendant's action caused [plaintiff] injury.

*In re Time Warner Inc. Secs. Litig.,* 9 F.3d 259, 264 (2d Cir.1993) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985)) (alteration in original); *accord Feinman v. Dean Witter Reynolds, Inc.,* 84 F.3d 539, 540 (2d Cir.1996); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995). Thus, in addition to the "in connection with" requirement, plaintiffs alleging a violation of Rule 10b–5 must also satisfy all of the elements of a traditional fraud claim, *e.g.,* scienter, materiality, reliance (or "transaction causation"), damages, and causation (or "loss causation"). *See Burke v. Jacoby,* 981 F.2d 1372, 1378 (2d Cir.1992). Those elements, moreover, must be "stated with particularity" in conformity with Rule 9(b), Fed.R.Civ.P.

The defendants argue that none of Press's three broad categories of claims—regarding markup, yield, and proceeds—satisfies any of the elements necessary to state a claim under Rule 10b–5, and that all three must therefore be dismissed.[10] The Court agrees that, whether or not Press's allegations might fulfill *some* of the requisite elements under the lenient standard applicable here,

way to permit comparison of instruments based on yield.

**8.** Given the conclusion that Press has failed to state a claim for violation of Rule 10b–10, the Court need not reach the issue of whether a private cause of action exists for a violation of that Rule. *See Levitin v. PaineWebber, Inc.,* 933 F.Supp. 325, 329 (S.D.N.Y.1996). *Cf. Arst v. Stifel, Nicolaus & Co.,* 86 F.3d 973, 977 (10th Cir.1996) (holding that defendants' failure to disclose stock purchasers' names in violation of Rule 10b–10(a)(7)(i) was not prohibited by Section 10(b) and therefore did not give rise to a private cause of action).

**9.** Rule 10b–5 states in full:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made,

not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

**10.** Defendants Pershing and DLJ argue that all of Press's 10b–5 claims must be dismissed as to them as a matter of law because the Complaint (i) fails even to *allege* any communication between them and Press prior to his Treasury bill purchase, thus precluding any claim of reliance upon a misrepresentation or omission on their part; and (ii) contains the concession that Pershing acted only as the "clearing broker" for Chemical. *See, e.g., In re Blech Secs. Litig.,* 928 F.Supp. 1279, 1295–96 (S.D.N.Y.1996) ("Even if [the defendant] knew but failed to disclose a material fact, no plaintiff can claim to have been defrauded by that omission, because, as a matter of law, a clearing broker owes no duty of disclosure to the clients of an introducing broker."). Although the Court is inclined to agree, because the Court finds that Press's 10b–5 claims must be dismissed also as to Chemical and Chase, there is no need to distinguish between the defendants in discussing those claims.

*none* of his claims sets forth *all* of the elements that a securities plaintiff must plead in order to survive a motion to dismiss. *See Acito*, 47 F.3d at 52.

### 1. Undisclosed "Markup"

 Press's first claim, that the defendants failed to disclose that they were charging him a markup (or the amount thereof) on his Treasury bill purchase—*i.e.*, that they were selling him the bill at a higher price than they had paid for it—asserts in essence that the defendants omitted a material fact.[11] When a claim is based on a material omission,

> positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1471–72, 31 L.Ed.2d 741 (1972);[12] *accord Burke*, 981 F.2d at 1379. In an omission case, therefore,

a defendant can avoid liability under Rule 10b–5 for nondisclosure of material information [only] by proving by a preponderance of the evidence that disclosure of that information would not have altered the plaintiff's investment decision.

*duPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987); *accord Burke*, 981 F.2d at 1379.

 While the plaintiff's ultimate burden in such a case is to demonstrate that the omitted facts were material, a plaintiff relying on an omission must in the first instance establish an affirmative duty of disclosure with respect to the information in question. As the Second Circuit has stated, "an omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." *Time Warner*, 9 F.3d at 267 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988)). Moreover, in a case like this where the issue is whether an individual has a duty of disclosure based on his "relationship to information"—and not his need to keep a prior statement from being misleading—"the inquiry as to his duty is quite distinct from the inquiry

---

**11.** To the extent that it professes a total ignorance of any markup, however, Press's allegation that "[a]t no time during the course of this transaction was [he] aware that [the] defendants obtained the Treasury bill for significantly less than they charged him" is likely incredible as a matter of law. As the defendants point out, it is completely unreasonable objectively for Press to have believed that the defendants were executing his securities transaction at cost, *i.e.*, that they were not charging him any fee in return for the provision of their services. *See First Independence Group, Inc. v. SEC*, 37 F.3d 30, 32 (2d Cir.1994) ("When a securities firm acts as a dealer, it is entitled to charge a reasonable markup on the wholesale price it pays for the securities."). This is particularly true in Press's case because he had purchased securities through the defendants in the past, including Treasury bills, and therefore knew (or should have known) their basic practices and operations. In this regard, Press has commenced at least one other very similar securities class action in this District, *see Press v. Quick & Reilly*, 96 Civ. 4278(RPP), 1997 WL 458666 (S.D.N.Y. Aug. 11, 1997), alleging violations of Section 10(b), Rules 10b–10 and 10b–5, and state common law in connection with the sharing of certain fees between introducing and clearing brokers without disclosure to, or consent of, investors. Press's complaint in that case was dismissed in its entirety. *Id.* at *5.

**12.** Although *Affiliated Ute* required only that an investor "might" have considered the omitted information to be important, the Court in *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), made clear that the test for determining materiality is whether an investor "would" find the information important. *Id.* at 449, 96 S.Ct. at 2132. More specifically,

> [a]n omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote [or in this case, whether to purchase a security] .... What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.; accord Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988); *Time Warner*, 9 F.3d at 267–68.

as to the information's materiality." *Id.* In other words,

> [t]he *materiality* of the information claimed not to have been disclosed ... *is not enough* to make out a sustainable claim of securities fraud. *Even if information is material, there is no liability under Rule 10b–5 unless there is a duty to disclose it.*

*Glazer v. Formica Corp.*, 964 F.2d 149, 156 (2d Cir.1992) (emphasis added) (quoting *Backman v. Polaroid Corp.*, 910 F.2d 10, 12 (1st Cir.1990) (en banc) (quoting *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987))). Thus, even assuming that information regarding the defendants' markup *was* material to Press's investment decision, a critical preliminary question remains whether the defendants had an obligation to apprise him of that information. *See San Leandro Emergency Med. Group Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 810 (2d Cir.1996) ("Even if we assume in this case that the company's marketing plans constituted material information, the important question to resolve is whether [the defendant] was under a duty to disclose the [information at issue].") The Court concludes, for the reasons set forth below, that the defendants had no such obligation in connection with the markup.

Press advances two rationales for finding a duty of disclosure here: (i) that the markup charged on his Treasury bill transaction was "excessive," and (ii) that the defendants had a fiduciary relationship toward him with respect to that transaction. The parties wholly agree, and for purposes of this analysis the Court therefore assumes, that brokers, even when acting as principals, have an obligation under the federal securities laws to disclose markups that may be deemed "excessive." *See, e.g., SEC v. Feminella*, 947 F.Supp. 722,

729 (S.D.N.Y.1996) (noting, without explicitly characterizing role of broker as either principal or agent, that "where a defendant exacts unreasonable profits resulting from a price which bears no reasonable relation to the prevailing price of the security, the antifraud provisions of the [securities laws] are violated") (internal quotations and citations omitted). The parties disagree, however, as to whether that rule applies to the markup in this case—$158.86, or roughly 1/6 of a percent of the price that the defendants paid for the Treasury bill.

Press alleges that the $158.86 amount is "approximately 5 times the industry standard of a spread of 1/32 of a percentage point" above market price.[13] The defendants counter by pointing to SEC releases which conclude that, in the context of "principal sales to customers" of debt securities, such as Press's Treasury bill purchase here, "common industry practice" is to charge a markup "of *between 1/32% and 3 1/2%* " over broker cost. *See Zero–Coupon Securities*, Exchange Act Release No. 34–24368, 1987 WL 112328, at *3 (S.E.C. April 21, 1987) (emphasis added). *See also In re Lehman Bros. Inc.*, Exchange Act Release No. 34–37763, 1996 WL 519914, at *6 (S.E.C. Sept. 12, 1996).

Although the determination as to whether a given markup is or is not excessive depends on a range of factors, *see id.* at *5 & n. 9; *Feminella*, 947 F.Supp. at 728–29, the Court has no hesitation in finding that the defendants' markup here is as a matter of law not excessive. Simply put, the markup is indisputably at the extreme low end of what the SEC considers to be acceptable, and Press provides absolutely no authority for his contention that "the standard industry spread" for such a markup is five times *less* than

---

13. Press also compares the markup to his $2,511 *return* on the transaction, which produces a ratio of greater than 6%; but that comparison is completely fallacious. As explained below, the markup over the defendants' purchase price, once assessed, never affected Press's investment return, which was plainly stated and known to him beforehand. In these types of Treasury bill transactions, where the expected return is often so small to begin with, such comparisons are inherently misleading. Here, for example, even a nominal processing fee of $50 would constitute

approximately 2% of Press's return. In any event, the SEC has made clear that the amount of a markup is determined by the "prevailing market price" of the security, the best evidence of which is the "dealer's contemporaneous cost of acquiring [the] security." *Zero–Coupon Securities*, Exchange Act Release No. 34–24368, 1987 WL 112328, at *3 (S.E.C. April 21, 1987). In other words, generally speaking, the markup is the amount charged over and above a security's wholesale price; in no way does it relate to the security's expected or eventual return.

what the defendants charged. More specifically, no authority of which this Court has been advised involves a markup even remotely as small as the 1/6 of a percent markup at issue in this case; indeed, from the Court's review, "excessiveness" appears not even to become a consideration in debt-security cases until markups reach the three to three and one-half percent range. *See, e.g., In re Lehman Bros.*, 1996 WL 519914, at *3–7. In sum, because the amount of the markup charged here by the defendants was not excessive, Press cannot establish *on that basis* that the defendants were obliged to disclose it to him at any time during the course of his Treasury bill transaction.

■■■ As for Press's alternate theory, he appears to argue that the defendants owed him a duty of disclosure based on his naked allegation in the Complaint that they "were his fiduciaries" for purposes of the Treasury bill transaction. This argument fails as well. Generally speaking, a fiduciary relationship exists under New York law " 'when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.' " *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir.1991) (quoting *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 521 N.Y.S.2d 672, 676 (1st Dep't 1987) (quoting Restatement (Second) of Torts § 874 comment a (1977))) (alteration in *Flickinger*). Such a relationship may inhere as between securities brokers and purchasers. *See, e.g., Scott v. Dime Sav. Bank of New York, FSB*, 886 F.Supp. 1073, 1079 (S.D.N.Y. 1995) ("[U]nder New York law, stockbrokers may owe fiduciary duties to their customers."), *aff'd*, 101 F.3d 107 (2d Cir.1996), *cert. denied*, ⸺ U.S. ⸺, 117 S.Ct. 1260, 137 L.Ed.2d 339 (1997); *Schenck v. Bear, Stearns & Co.*, 484 F.Supp. 937, 946

(S.D.N.Y.1979), *overruled on other grounds by Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 509 (2d Cir.1994).

■■■ Nevertheless, the "mere existence of a broker-customer relationship is not proof of its fiduciary character." *Bissell v. Merrill Lynch & Co.*, 937 F.Supp. 237, 246 (S.D.N.Y. 1996) (quoting *Rush v. Oppenheimer & Co.*, 681 F.Supp. 1045, 1055 (S.D.N.Y.1988)). Indeed, "New York courts repeatedly have held that 'a broker does not, in the ordinary course of business, owe a fiduciary duty to a purchaser of securities.' " *A. Ronald Sirna, Jr., P.C. Profit Sharing Plan v. Prudential Secs., Inc.*, 964 F.Supp. 147, 152 (S.D.N.Y. 1997) (quoting *Fekety v. Gruntal & Co.*, 191 A.D.2d 370, 595 N.Y.S.2d 190, 190–91 (1st Dep't 1993)); *accord Perl v. Smith Barney Inc.*, 230 A.D.2d 664, 646 N.Y.S.2d 678, 680 (1st Dep't 1996). This is because a broker's fiduciary obligation, if any, "is *limited to affairs entrusted to the broker*, and '[t]he scope of affairs entrusted to the broker is generally limited to the completion of a transaction.' " *Bissell*, 937 F.Supp. at 246 (quoting *Schenck*, 484 F.Supp. at 947) (alteration in *Bissell*) (emphasis added). *See also Rush*, 681 F.Supp. at 1055.

■■■ The crucial factor in determining whether a broker has been "entrusted" with particular matters such that a fiduciary obligation attaches, appears to be whether the broker exercises discretion over those matters. In other words, *"[i]n the absence of discretionary trading authority* delegated by the customer to the broker . . . *a broker does not owe a general fiduciary duty to his client."* *Bissell*, 937 F.Supp. at 246 (emphasis added).[14] *See Schenck*, 484 F.Supp. at 947 (where defendant "had neither discretion nor responsibility over supervision of plaintiff's account" for certain matters, the "mat-

---

14. Press argues in opposing this motion that "[a] broker acts in a fiduciary capacity when executing customer trades . . . and is subject to disclosure duties with respect to commissions." Even assuming for purposes of this analysis that "commissions" equate with "markups," the only relevant authority Press cites for this sweeping assertion is *Conway v. Icahn & Co., Inc.*, 16 F.3d 504 (2d Cir.1994); but that case simply states, in the context of an action for breach of fiduciary duty, the unremarkable proposition that a broker, "as

*agent,* has a duty to use reasonable efforts to give its principal information relevant to the affairs that have been entrusted to it." *Id.* at 510 (emphasis added). Indeed, *Conway* is perfectly consistent with the cases cited above, inasmuch as it holds that the defendant-broker "had a duty to notify Conway" before executing transactions on his account because the account "was a nondiscretionary one, [and] his authorization for all purchases and sales was required." *Id.*

ters were not entrusted to [defendant], [and] there was no fiduciary obligation between [defendant] and plaintiff with respect to" those matters). *See also Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir.1991) ("Shearson owed no fiduciary duty to HMK other than to execute the trades requested because the accounts were non-discretionary."); *Lowenbraun v. L.F. Rothschild*, 685 F.Supp. 336, 343 (S.D.N.Y. 1988) ("A broker who has discretionary powers over an account owes his client fiduciary duties, and shares a principal-agent relationship with the client.") (citing *Rolf v. Blyth Eastman Dillon & Co.*, 570 F.2d 38, 45 (2d Cir.1978)). *Cf., e.g., Howell v. Freifeld*, 631 F.Supp. 1222, 1224 (S.D.N.Y.1986) ("[I]t is significant that plaintiff maintained a discretionary account with [defendant]. This imposed upon [defendant] 'broad' fiduciary duties to plaintiff with respect to the management of the account.").

Under these standards, Press cannot establish that the defendants owed him a fiduciary duty—thereby requiring them to disclose the markup—because his Complaint contains absolutely no allegations indicating that they had any discretionary authority whatever with respect to the transaction they executed on his behalf. Indeed, his unequivocal and consistent allegations support precisely the opposite conclusion, *i.e.*, that he entered into a single, arms-length transaction with the defendants, in which their sole function was to purchase and eventually pay over the proceeds of a single instrument specifically chosen by him.

The Complaint recites that Press telephoned Chemical and inquired about buying a six-month Treasury bill worth approximately $100,000; he spoke to Chemical's employee Green, who informed him, *inter alia*, of the price he would have to pay and the return he would receive; he went to Chemical's premises and purchased the bill; he later communicated with Chemical about obtaining the proceeds on the maturity date; and he ultimately received from Chemical a check in the amount of the proceeds. These allegations "do not purport to assert a relationship different from that of an ordinary broker-client relationship," *Perl*, 646

N.Y.S.2d at 680, and consequently, the allegations are insufficient to establish that the defendants owed Press a fiduciary duty with respect to his Treasury bill transaction. *See, e.g., Salzmann v. Prudential Secs. Inc.*, 91 Civ. 4253(KTD), 1994 WL 191855, at *7 (S.D.N.Y. May 16, 1994) (holding that because plaintiffs' "allegations suggest that the relationship [with defendants] was typical," inasmuch as plaintiffs' account was "non-discretionary" and they "pre-approved every trade," defendants "did not owe plaintiffs a fiduciary duty"). *Cf., e.g., Flickinger*, 947 F.2d at 599 (fiduciary relationship did exist where broker and customer "had a longstanding relationship during which [broker] provided investment advice and services"); *Shahzad v. H.J. Meyers & Co.*, 95 Civ. 6196(DAB), 1997 WL 47817, at *11 (S.D.N.Y. Feb. 6, 1997) (unlike case where plaintiff "was simply a purchaser 'in the ordinary course of business,' who did not have an ongoing relationship with the broker-defendant," here "Plaintiff entrusted Defendants to purchase securities on thirteen occasions . . . and acted upon the advice of the Defendants and did not simply put in orders of the stocks he wished to purchase").

Given Press's inability to establish that the defendants were his fiduciaries for purposes of the transaction at issue, his claim that they owed him a duty of disclosure on the basis of a fiduciary relationship necessarily fails. Accordingly, because Press's allegation of a material omission with respect to the defendants' markup cannot succeed absent a showing that they had a duty to disclose such information, his markup claim must be dismissed.

### 2. *Misrepresentation of Yield*

■ Press's claim that the defendants misrepresented the yield on his transaction is equally deficient under Rule 10b–5. In the first place, it is difficult to see how Press relied in deciding whether to purchase the Treasury bill on the yield figure reported in his trade confirmation form, when he concedes that he received the form "several days [ ]after" the purchase. Press argues in opposing this motion that purchasers of Treasury securities such as himself "reasonably

rely upon the fact that they will receive an accurate disclosure of the yield on their securities," and he seeks leave to replead a more detailed accounting of the fact that, at the time of his transaction, he "requested and received express representations concerning the yield."

Nevertheless, even if Press could amend his Complaint to allege reliance, or even if he were entitled to a presumption of reliance insofar as he alleges a material omission,[15] Press still cannot succeed on his yield claim because the substantive allegation on which it depends fails as a matter of law to establish a material consideration. In short, the difference between the 178 day period from settlement to maturity that was actually used to calculate his yield figure, and the 181 day period from purchase to maturity that he claims should have been used, is immaterial as a matter of law.[16] No rational juror could conclude that, in determining whether to purchase the Treasury bill at issue, it would have "assumed actual significance" in the deliberations of a reasonable inventor, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), to learn that the proffered yield figure for the transaction understated the value of the investment by the trivial monetary equivalent of a three-day expansion in the maturity period. The information concerning yield therefore cannot serve as the basis of either a misrepresentation or a material omission, and Press's claim based on that information must be dismissed.

### 3. *Delayed Access to Proceeds*

■ Press's final claim under Section 10(b) and Rule 10b–5 is that he entered into the Treasury bill purchase in reliance on the fact that he would be able to receive the proceeds of that transaction on the stated May 9, 1996 maturity date. That allegation is deficient as a matter of law for several reasons, including failure to plead materiality adequately; that is, Press cannot plausibly show that the mere two-day difference in the availability of the proceeds (or four-day difference in receipt) would have been a material factor in his decision whether to purchase the Treasury bill.[17] *Cf. Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 541 (2d Cir.1996) ("[R]easonable minds could not find that an individual investing in the stock market would be affected in a decision to purchase or sell a security by knowledge that the broker was pocketing a dollar or two of the fee charged for the transaction .") The Court also finds Press's proceeds claim flawed in two additional respects: it fails to satisfy the "in connection with" requirement of Rule 10b–5, and is grounded on insufficient allegations of scienter under Rule 9(b), Fed.R.Civ.P.

■ First, the defendants' failure to advise Press that he would be unable to obtain the proceeds of his investment on the maturity date does not constitute a fraudulent omission "in connection with the purchase or sale of a security," as is necessary to state a claim under Section 10(b). *Shapiro v. Cantor*, 123 F.3d 717, 720–21 (2d Cir.1997). To satisfy this requirement, a plaintiff need only demonstrate "an injury as a result of deceptive practices 'touching' its purchase or sale of securities." *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 967 (2d Cir. 1993) (quoting *Superintendent of Ins. of the State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12–13, 92 S.Ct. 165, 168–169, 30 L.Ed.2d 128 (1971)). Nevertheless, "the inci-

---

**15.** Although Press repeatedly asserts that the confirmation form "misrepresented" the yield, the Complaint also alleges that he *"was never informed ...* that the yield calculations provided in his trade confirmation [were] not from the date of his trade" but were instead based on the settlement date. (Emphasis added.)

**16.** Based on Press's $99,488.42 purchase price, his $2,511.58 return, and the reported yield figure of 5.177, the defendants quote the actual difference in yield between these two maturity periods as .056% or .00056. The Court calculates the difference at .086% or .00086, which would reduce the yield figure for Press's investment over a 181 day period from 5.177 to 5.091. In either case, the difference in return created by this minimal reduction in the yield figure is insignificant.

**17.** To take the simplest example, had Press's goal been to put his $102,000 proceeds into an interest-bearing account, the delay in access—even assuming an extraordinary interest rate of 10%, *twice* what Press received on his Treasury bill—would have deprived him of a mere $28 per day.

dental involvement of securities d[oes] not implicate the anti-fraud provisions of the federal securities laws," that is, the fraud alleged must be "integral to the purchase and sale of the securities in question." *Pross v. Katz,* 784 F.2d 455, 459 (2d Cir.1986). In the usual case, the requisite connection is satisfied "when the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations *as to its value.*" *Ames,* 991 F.2d at 967 (emphasis added). As Judge Friendly explained, the purpose of Section 10(b) and Rule 10b–5 "is to protect persons who are deceived in securities transactions— to make sure that buyers of securities *get what they think they are getting.*" *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.1984) (emphasis added).

■ Following *Chemical Bank* and *Pross,* courts within this Circuit have consistently held that "[m]isrepresentations or omissions involved in a securities transaction but not pertaining to the securities themselves cannot form the basis of a violation of Section 10(b) or Rule 10b–5." *Manufacturers Hanover Trust Co. v. Smith Barney, Harris Upham & Co.,* 770 F.Supp. 176, 181 (S.D.N.Y.1991) (citing *Chemical Bank,* 726 F.2d at 943; *Pross,* 784 F.2d at 459) In particular, the majority of recent cases concur that, for a plaintiff's complaint to state a viable cause of action, "the misrepresentation *must relate to the value of the security.*"[18] *Vigilant Ins. Co. v. C. & F. Brokerage Servs.,* 751 F.Supp. 436, 438 (S.D.N.Y.1990) (emphasis added). *See also Bissell v. Merrill Lynch & Co.,* 937 F.Supp. 237, 242–43 (S.D.N.Y. 1996) (citing cases).

Under these standards, the defendants' omission of information regarding the precise date on which Press could obtain his proceeds did not occur "in connection with" his purchase of the Treasury bill that produced those proceeds. At most this information related to an implied promise by the defendants that, upon maturity of the bill, Press would be afforded prompt access to the proceeds. But the exact availability date was not "integral" to the purchase or sale of the bill, *Pross,* 784 F.2d at 459, and in no way concerned its "value" as a security, *Vigilant,* 751 F.Supp. at 438, or affected the total amount of Press's return.[19] To the contrary, the release date of the proceeds was "merely a term of the arrangement between the broker and its customer under which the broker conducts [Treasury bill purchases] for the customer." *Levitin v. PaineWebber, Inc.,* 933 F.Supp. 325, 329 (S.D.N.Y.1996) (holding that broker's alleged failure to disclose that it used customers' collateral and proceeds from short sales to earn interest and gain other financial benefits stated no claim under Section 10(b) or Rule 10b–5). In other words, even if the defendants did make an omission or misrepresentation regarding the date on which Press could access his Treasury bill proceeds,

> [t]his sort of misrepresentation … goes not to any inducement by the defendants regarding the investment purpose of the sale, but to the arrangements concerning the mechanics of the sale.

*Bosio v. Norbay Secs., Inc.,* 599 F.Supp. 1563, 1566 (E.D.N.Y.1985) (holding that no claims were stated under Section 10(b) by allegations that defendant fraudulently promised to follow plaintiff's instructions regarding stock sales and falsely represented that he would forward sale proceeds to plaintiff). Thus, Press did "get what [he] th[ought] [he] [was] getting" in his Treasury bill purchase, *Chemical Bank,* 726 F.2d at 943, notwithstanding anything that the defendants said or omitted to say about the date the proceeds of that purchase would be available. His claim based on the delivery of those proceeds

---

**18.** Press quotes *A.T. Brod & Co. v. Perlow,* 375 F.2d 393, 396–97 (2d Cir.1967), for the proposition that neither Section 10(b) nor Rule 10b–5 "were intended to deal only with fraud as to the 'investment value' of securities." But as Judge Schwartz pointed out in rejecting an identical claim in *Bissell v. Merrill Lynch & Co.,* 937 F.Supp. 237 (S.D.N.Y.1996), such an expansive view of the "in connection with" requirement is unwarranted under Judge Friendly's analysis of

*Brod* in *Chemical Bank. See Bissell,* 937 F.Supp. at 243.

**19.** As noted, Press received the full $102,000 return on his investment, minus $15 dollars that the defendants attributed to a courier charge and a $3 credit to Press's account. These amounts are immaterial to Press's investment decision given the size of the transaction at issue.

therefore fails to satisfy the "in connection with" requirement of Rule 10b–5 and must be dismissed.

■ Press's proceeds claim also fails to meet the special requirements for pleading scienter under Rule 9(b). A plaintiff alleging fraud must assert scienter, or fraudulent intent,

> either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir .1994).[20] In either case, however, "the facts alleged in the complaint must give[ ] rise to a *'strong inference'* of *fraudulent intent.*" *Time Warner*, 9 F.3d at 268 (alteration in original) (internal quotations and citations omitted) (emphasis added); *accord Acito*, 47 F.3d at 52. The allegations in Press's Complaint give rise to no such inference here.[21]

■ As noted, the Complaint states that the defendants "knowingly or recklessly" made "materially false and misleading statements" or "failed to disclose material facts" to Press and the class, had "actual knowledge of the materially false and misleading statements" and omissions, and "intended to deceive [Press] and members of the class or acted with reckless disregard for the truth." These are mere conclusory assertions, however, wholly unsupported by the substantive allegations that precede them in the Complaint. Press's own account of his dealings with Chemical, from his first inquiry regarding a Treasury bill purchase to his. final receipt of the proceeds, reveals those transactions to have been totally benign. His allegations do not come close to raising a "strong inference" that Chemical and Pershing either had a motive to defraud him or displayed conscious misbehavior or recklessness toward him.[22] *Shields*, 25 F.3d at 1128. Indeed, the Court would find otherwise if it were required to do so. At the very least, the Court cannot find that the facts alleged in Press's Complaint concerning the date on which his proceeds became available raise a sufficient inference of fraudulent intent to survive a motion to dismiss.

### C. Remaining Claims

Press also seeks to impose liability on Chase and DLJ as the "controlling persons" of Chemical and Pershing under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a). But that claim for derivative liability fails *a fortiori* in light of the Court's dismissal of Press's claims under Section 10(b) and Rules 10b–5 and 10b–10. *See Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 16–17 (2d Cir.1983). As to Press's state law causes of action, the Complaint contains no allegations to support diversity jurisdiction, and the Court declines to exercise supplemental jurisdiction over those claims.

### CONCLUSION

Press's claims under the federal securities laws are dismissed with prejudice, and his claims under state common law are dismissed without prejudice pursuant to this Court's

---

**20.** Motive requires a showing of "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," and opportunity requires a showing of "the means and likely prospect of achieving the concrete benefits by the means alleged." *Shields*, 25 F.3d at 1129. To allege conscious misbehavior or recklessness, the complaint must link a misleading statement to facts creating an inference that the speaker had some basis for knowing that the statement was misleading. *Id.*

**21.** The parties dispute whether the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4, has heightened the requirement for pleading scienter. Although some recent cases appear to have reached such a conclusion, *see,* *e.g., Norwood Venture Corp. v. Converse Inc.*, 959 F.Supp. 205, 208–209 (S.D.N.Y.1997); *In re Baesa Secs. Litig.*, 969 F.Supp. 238, 242 (S.D.N.Y. 1997), other cases have held to the contrary, *see, e.g., In re Health Management, Inc. Secs. Litig.*, 970 F.Supp. 192, 201 (E.D.N.Y.1997); *Press v. Quick & Reilly*, 96 Civ. 4278(RPP), 1997 WL 458666, at *2 n. 2 (S.D.N.Y. Aug. 11, 1997). The Court need not address this issue, however, because it concludes that Press's Complaint fails to plead the requisite "strong inference" of fraudulent intent even under the traditional Second Circuit standard.

**22.** For this same reason, Press's "markup" and "yield" claims also fail to meet the requirements of Rule 9(b).

discretion under 28 U,S.C. § 1367(c)(3). Because this is an Amended Complaint and the deficiencies in the pleadings cannot be cured by further amendment, Press will not be granted leave to amend.[23] The Clerk of Court is directed to enter judgment for the defendants and close the case.

SO ORDERED.

23. Press has asked for leave to amend only with regard to his claim based on the alleged misrepresentation of the yield. Because, for the reasons discussed above, the proposed amendment would not rehabilitate the pleading, the motion is denied.