Vʀᴇᴊ Sᴀʙᴏᴜɴᴅᴊɪᴀɴ et al., Respondents, v Bᴀɴᴋ Aᴜᴅɪ (USA), Appellant.

First Department, May 22, 1990

### APPEARANCES OF COUNSEL

*Joseph H. Einstein* of counsel *(Goodkind, Labaton & Rudoff,* attorneys), for respondents.

*Paul M. Brown* of counsel *(Whitman & Ransom,* attorneys), for appellant.

## OPINION OF THE COURT

SULLIVAN, J.

At issue is the extent of liability, if any, of a bank to its customer for failure to execute a foreign currency trade order when the customer unreasonably refuses to mitigate his damages. The basic facts are not in dispute.

Plaintiff Vrej Saboundjian, a sophisticated international businessman, well acquainted with the foreign exchange market, had become a customer of Bank Audi, the defendant, in June 1984, and, on or about April 10, 1986, began to speculate in foreign currency through the bank, which set a $5,000,000 limit on his total trading position, with a collateral requirement of 10% on deposit. Earlier, on or about March 25, 1986, $500,000 had been transferred from the Paris bank account of his mother, plaintiff Anahid Saboundjian, to her Bank Audi account. In deference to the source of the collateral, plaintiff's first transaction was conducted by the bank in his mother's name. At his request, however, all future trades were made in his own name. His mother's account was thereafter converted to a joint account, over which plaintiff was given a power of attorney.

There is no written agreement between the bank and customers specifically governing foreign currency speculation transactions, although paragraph 33 of the bank's General Rules and Conditions governing customer accounts contains a disclaimer of liability except for gross negligence. Sonia Dereyan, one of the bank's foreign exchange traders did, however, discuss currency trading with plaintiff and told him that all trades would be executed only at his express direction. Plaintiff was also informed, as he freely admits, that the bank charges a commission that is added to the price at which a customer requests his order to be executed. Although plaintiff was in frequent communication with the bank, he made all of his trading decisions himself. The bank would issue to him a confirmation of each trade as well as a monthly statement of account setting forth all the transactions undertaken on his behalf during that period.

It should be noted that the foreign currency trading market, which is global, operates without a central exchange and with individual banks throughout the world setting their own rates. Since the market operates on a 24-hour basis, trading can be pursued "around the clock". Thus, a foreign exchange speculator such as plaintiff, by sending orders to Far East, Middle

East and European markets, is able to participate in foreign exchange trading even after the close of business at domestic banks.

On the afternoon of January 7, 1987, plaintiff contends, he asked Dereyan to liquidate his short position by selling $2,000,000 when "deutsche marks reached 1.9360 per dollar". The bank contends that Dereyan understood the request to be to liquidate when the price of deutsche marks reached 1.9365. In any event, as it customarily does when an order is placed in the late afternoon or evening, and the customer's price is not available in the domestic market, the bank relayed plaintiff's order to a foreign bank, in this case, Investbank, in Sharjah, United Arab Emirates, to be executed. The bank's commission of .0015, covering profit and expenses for performing the trade, was added to the price requested by plaintiff. Thus, the order, placed at approximately 3:24 P.M. EST on January 7, called for the bank to sell $2,000,000 against deutsche marks at the rate of 1.9380 deutsche marks per dollar.

At about 8:00 A.M. on the following day, January 8, Dereyan, after noticing that confirmation of the requested transaction had not been received, telephoned Investbank to ascertain whether the order had been executed, and was advised that it had been unable to do so. Dereyan then called Bank Audi (Paris) and Bank Audi (Geneva) and was told that the market had been "very hectic" and that the requested price had been quoted in the market only briefly and thereafter dropped quickly.

Sometime prior to 9:00 A.M., after she had conferred with the other banks, Dereyan received a call from plaintiff, who was informed that the order had been placed, but that Investbank had been unable to effect a sale. During that telephone conversation plaintiff was also informed of the current market price, and told that his order could be executed at that price if he desired. Had plaintiff's order been executed at that price, he would have made a profit, as he has testified, of a "couple of thousand dollars". Indeed, the profit would have equaled approximately $4,700, only somewhat less than the approximately $8,000 profit plaintiff alleges he would have made, had the original January 7 order been effected at 1.9380. Plaintiff, however, did not want the bank to execute at that price and stated, "Don't worry, I am bullish".

Shortly thereafter plaintiff arrived at the bank and re-

mained there with Dereyan for a period of time without taking any action. From the profit he could have realized earlier that morning, his position deteriorated to a small loss by day's end. Plaintiff's position throughout that day is best expressed by his testimony at his examination before trial: "I thought that if I wait maybe a couple of hours or one day, that I could see my price again and if I don't see the price, I said, you have to take the loss as the bank."

In fact, plaintiff did not ask the bank to close out his position until, at the earliest, February 6, 1987,[1] nearly a month after the January 7 unexecuted order, by which time the value of the dollar in terms of deutsche marks had fallen to 1.8695 and his combined losses, including those from unrelated trading positions, were approximately $422,237.05. Plaintiff admits that he had a number of different foreign currency positions open with the bank at various times prior to the date on which he authorized it to close out his trading account. He has testified that he and his mother had four foreign exchange positions, separate and distinct from one another, with the bank at the time. Aside from the trade at issue, plaintiff had a position which was opened on December 23, 1986 for $500,000 at 1.9678, a position of $1,000,000 opened on December 31, 1986 at 1.9510 and a $1,000,000 position in Saudi riyals opened on December 14, 1986 at 3.7385. Since plaintiff had authorized the bank to charge his mother's account for any losses he incurred in foreign exchange transactions, her money market account was debited $422,227.05 on February 17, 1987.

Plaintiff and his mother thereafter commenced this action, alleging consequential damages in excess of $400,000 and limiting his claim to the bank's failure to execute the January 7 foreign currency trade order. He concedes that he is not challenging the bank's handling of the other trading positions he held. After joinder of issue and the completion of extensive discovery by each side, the bank moved for summary judgment dismissal of the complaint, arguing that the January 7th order was not executed due to volatile market conditions over which it had no control and that, in any event, plaintiff's own conduct contributed to the loss. Alternatively, the bank sought partial summary judgment limiting the

---

1. This is the date which plaintiff gave in his affidavit in opposition to defendant's motion for summary judgment. At his deposition, he stated that he "believe[d]" that he instructed the bank to close out his position on February 27.

amount of its liability to the difference between plaintiff's profit had the transaction been carried out as requested and the smaller profit plaintiff would have realized had he, after learning of the failure of the January 7th trade, acted to cover by selling on January 8th. The motion was supported by the affidavits and deposition testimony of the bank's employees as well as plaintiff's deposition testimony and diary entries. The court denied the motion in its entirety, finding that the existence of triable issues of fact precluded an award of summary judgment. We modify to grant partial summary judgment limiting the bank's liability.

Once an order for the sale of securities is accepted, a broker has a duty to execute it in accordance with the instructions given and is liable for the resultant loss if it fails to do so. *(See, Sparling v Wade,* 210 App Div 774, 777; 11 NY Jur 2d, Brokers, § 51.) The relationship between a customer and his stockbroker is that of principal and agent; the duty owed by the stockbroker is that of a fiduciary. (11 NY Jur 2d, Brokers, § 45, at 393.) The customer has the right to repudiate the broker's failure and to insist upon the benefit of the transaction as though the order had been properly executed. *(Newburger v Levinson,* 195 App Div 502, 507.) Of course, a broker may not be held liable for conditions entirely beyond its control. *(See, Meunier v Conti Commodity Servs.,* 374 So 2d 193, 196 [La App, 4th Cir].)

With these principles in mind, we believe that the bank is not entitled, as a matter of law, to judgment dismissing the complaint. An issue of fact is presented as to whether the commission that, in accordance with a bank custom known to plaintiff, was added to the price at which the deutsche marks were to be purchased was excessive, thus preventing execution of the transaction. Moreover, whether the failure to execute the transaction was, as the bank claims, the result of a volatile market presents questions of fact not answerable on this record. The latter issue, in particular, gives rise to other related inquiries, including, but not limited to, the selection of Investbank, its competence and the availability of other institutions for the placement of plaintiff's order.

The bank also relies on its account agreement which, it argues, exculpates it "except in cases of gross negligence." This claim was not raised in the motion court and, generally, should not be considered when raised for the first time on appeal. *(See, Bile v Bile,* 95 AD2d 719.) In any event, the clause, which reads, "Any damage caused by legalization

errors, undetected falsification, customer or other person's legal incapacity, mail, telex, telephone, telegraph problems or any other transmission or transport problems especially if caused by loss, delay, mutilation, duplication or misunderstanding is borne by the Customer, except in cases of gross negligence," cannot shield the bank from its alleged wrongful conduct since it does not address the situation here presented. The clear import of this exculpatory language is to protect the bank if communications fail, or an instruction from a third party is forged and the like. It does not relieve the bank from liability for its failure to follow express instructions or the breach of a fiduciary duty.

In any event, even assuming that the bank is liable for failing to execute the January 7, 1987 trade, liability is limited to the difference between the price at which plaintiff could have executed the trade at issue, were it not for the failure to carry it out, and the price at which he could have executed the transaction within a reasonable time after he learned that it had not been effected earlier. *(See, Brown v Pressner Trading Corp.,* 101 AD2d 761, 762.) Since plaintiff had a duty to act reasonably and to mitigate any damages he may have sustained, the bank cannot be held liable for his entire speculative investment, including losses realized on unrelated transactions. Thus, "[w]hen a broker wrongfully fails to purchase or sell a security as directed, the customer's damages are limited to the cost of covering or replacing the security. If the customer fails to cover within a reasonable time, damages are limited to the potential cost to cover, measured from the time he learns of the broker's failure and for a reasonable time thereafter in which he must decide his course of action. * * * A customer may not * * * refuse to cover a transaction previously requested and thereby speculate on the market entirely at the risk of the broker" *(supra,* at 762).

Article 2 of the Uniform Commercial Code is also instructive on the issue of damages.[2] Under Uniform Commercial Code § 2-712 (1), in the event of a breach, "the buyer may 'cover' by making in good faith and without unreasonable

---

2. The Uniform Commercial Code is applicable to foreign exchange transactions, since "the Code excludes 'money' only when it is a medium of payment, not when treated as a commodity". (NY Annots to Uniform Commercial Code § 2-105, McKinney's Cons Laws of NY, Book 62½, at 97 [1964]; *see also, Melzer v Zimmerman,* 118 Misc 407, 408, *affd* 205 App Div 886.)

delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." Furthermore, the buyer may only recover from the seller "as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages". (Uniform Commercial Code § 2-712 [2].) Consequential damages are restricted, however, to those "which could not reasonably be prevented by cover or otherwise". (Uniform Commercial Code § 2-715 [2].) Thus, plaintiff is not entitled to consequential damages since he was in a position to effect cover immediately after having been notified of the bank's failure to execute the January 7 order.

Plaintiff's damages are therefore limited to no more than the difference between the profit he would have earned had the subject trade been executed on January 7, 1987, or approximately $8,000 as alleged in the complaint, and the profit that plaintiff would have earned had he directed the execution of the trade within a reasonable time after he learned that his original order had not been executed.

Accordingly, the order of the Supreme Court, New York County (Irma Vidal Santaella, J.), entered on or about April 27, 1989, denying, in its entirety, defendant's motion for summary judgment, should be modified, on the law, to the extent of granting defendant partial summary judgment limiting plaintiff's damages to the difference between the profit he would have earned had the subject trade been executed on January 7, 1987 and the profit that he would have earned had he directed the execution of the trade within a reasonable time after he learned that his original order had not been executed, and, except as thus modified, affirmed, without costs or disbursements.

MURPHY, P. J., ROSS, KASSAL and SMITH, JJ., concur.

Order, Supreme Court, New York County, entered on or about April 27, 1989, unanimously modified, on the law, to the extent of granting defendant partial summary judgment limiting plaintiff's damages to the difference between the profit he would have earned had the subject trade been executed on January 7, 1987 and the profit that he would have earned had he directed the execution of the trade within a reasonable time after he learned that his original order had not been executed, and, except as thus modified, affirmed, without costs and without disbursements.