**Donald PRESS, on behalf of himself and all others similarly situated, Plaintiff–Appellant,**

v.

**CHEMICAL INVESTMENT SERVICES CORP., Chase Manhattan Corporation, Pershing, a Corporate Division of Donaldson, Lufkin & Jenrette Securities Corporation, and Donaldson, Lufkin & Jenrette Securities Corporation, Defendants–Appellees.**

**Docket No. 98–7123.**

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 1998.

Decided Feb. 4, 1999.

Roger W. Kirby, New York, N.Y. (Alice McInerney, Kaufman, Malchman, Kirby & Squire, LLP, of counsel), for Plaintiff–Appellant.

Ahuva Genack, New York, N.Y. (Matthew G. Leonard, Chase Manhattan Legal Department, of counsel), for Defendants–Appellees Chemical Investment Services Corp. and Chase Manhattan Corporation.

Stephen L. Ratner, New York, N.Y. (Joseph Zuckerman, Rosenman & Colin LLP, of counsel), for Defendants–Appellees Pershing, a Corporate Division of Donaldson, Lufkin &

Jenrette Securities Corporation, and Donaldson, Lufkin & Jenrette Securities Corporation.

(Jonathan I. Blackman, Giovanni P. Prezioso, Jean E. Kalicki, Onnig H. Dombalagian, Cleary, Gottlieb, Steen & Hamilton; Paul Saltzman, Sarah M. Starkweather, The Bond Market Association, New York, NY), for The Bond Market Association as Amicus Curiae.

(Paul Gonson, Solicitor, Colleen P. Mahoney, Acting General Counsel, Jacob H. Stillman, Associate General Counsel, Susan S. McDonald, Senior Litigation Counsel, Luis de la Torre, Attorney, Securities and Exchange Commission, Washington, DC), for The Securities and Exchange Commission, Amicus Curiae.

Before: OAKES and WALKER, Circuit Judges, and KNAPP, District Judge.*

OAKES, Senior Circuit Judge:

*Introduction*

Plaintiff–Appellant Donald Press, on behalf of himself and all others similarly situated, appeals the District Court's dismissal of his claims for relief. The dismissal of Press's claims by the District Court for the Southern District of New York (Denise Cote, *Judge*) is affirmed.

*Background*

Plaintiff–Appellant Donald Press[1] purchased a Treasury bill ("T-bill") in November 1995 through Defendant–Appellee Chemical Investment Services Corp., a registered securities broker-dealer, that is wholly owned by Defendant–Appellee Chase Manhattan Corporation. The trade was cleared through Defendant–Appellee Pershing, a division of Defendant–Appellee Donaldson, Lufkin & Jenrette Securities Corporation. Pershing and Donaldson, Lufkin are both registered securities broker-dealers. Press purchased the T-bill for $99,488.42, to mature in 6 months at $102,000.

---

* Honorable Whitman Knapp, United States Senior District Judge for the Southern District of New York, sitting by designation.

1. The caption under which Appellant Press filed this appeal indicates that he is suing on behalf of himself and others similarly situated vis-a-vis a

class action, but the district court did not address whether the class was certified under Fed. R.Civ.P. 23. For purposes of res judicata, we will assume the class was not certified and therefore this opinion pertains only to Appellant Press.

After purchasing the T-bill, he had discussions with the appellees, requesting that the proceeds of the bill at maturity be express mailed to him or that he be able to pick up the proceeds on the day of maturity at one of the New York City Pershing or Chemical locations. (He purchased the bill through a New York City location.) He was told that he could not pick up a check for the proceeds in New York City, though they could be express mailed or wired for an additional fee. Otherwise he would have to wait for the check for the proceeds to arrive via regular mail. He opted to have the check express mailed to him at maturity for an additional fee. Four days (including a weekend) after the maturity date, he received a check for $101,985.

He maintains that the appellees fraudulently did not disclose that the funds at maturity would not be immediately available. Therefore, the period over which the yield should have been calculated was longer than the appellees represented, so the yield advertised was, he claims, fraudulently inaccurate. He contends that the appellees structured the transaction in this manner to allow themselves more time to use his funds.

Press was also not told that the appellees were taking a $158.86 markup[2] from the transaction. This, he argues, is an excessive fee relative to the bill's yield, such that the appellees had the obligation under the federal securities laws to disclose it. Moreover, he maintains that the appellees also had a fiduciary obligation to Press to disclose the fee.

Press brought suit in the Southern District of New York, contending that the appellees' actions violated the federal securities laws, including Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rules 10b–5 and 10b–10 (17 C.F.R.

§§ 240.10b–5 and 240.10b–10) promulgated thereunder.

The defendants moved to dismiss the Amended Complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6). The district court granted the defendants' motion in full, and Press's federal claims were dismissed in their entirety.

In the supporting opinion, the district court assessed Press's claims as falling into three categories: (1) the "markup" he paid in purchasing the security through the defendants; (2) the yield figures reported on his trade confirmation form; and (3) the delay he experienced in receiving the trade proceeds. *See Press v. Chem. Inv. Servs. Corp.,* 988 F.Supp. 375, 380 (S.D.N.Y.1997). The court held that none of the assertions presented a viable claim under the federal securities laws.

As a matter of law, the court held that the markup was not excessive, so the appellees had no obligation to disclose it. *See id.* at 384–86. Alternatively, the court held that the appellees were not fiduciaries of the appellant and therefore had no additional disclosure obligations. *See id.* at 386–76.

As to the misrepresentation of yield claim, the court held that no rational juror could conclude that the difference in yield as calculated over a 178–day period versus the 180–day period would have actual significance in the deliberation of the rational investor. *See id.* at 388. The yield claim was therefore dismissed.

Finally, the court held that Press's claim that he purchased the bill in reliance on the fact that he would receive the proceeds on May 9, 1996, the maturity date, failed as a matter of law because he could not show that (1) the delay in receipt of the proceeds would have been a material factor in his decision to purchase the bill; (2) the fraud alleged occurred "in connection with" the sale of a

---

**2.** A markup is the difference between the price charged to a customer for a security and the prevailing market price for the security, when the seller of the security is acting as a principal, holding ownership of the security and selling it to the customer. *See Securities and Exchange Com'n v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1469 (2d Cir.1996). The trade confirmation form, mailed to Press after he purchased the T-

bill, indicated on the back side that Chemical Investment Services was acting as a principal in the transaction. Were Chemical acting as an agent, purchasing the T-bill for Press without actually taking ownership of the T-bill prior to transferring it to Press, the remuneration to Chemical for executing the transaction would be referred to as a commission, as opposed to a markup.

security as required under 10(b); and (3) the special pleading requirements for scienter under Rule 9(b) were met. *See id.* at 388–90.

*Discussion*

Press maintains that he did plead all of the elements of fraud under the securities law sufficient to present to a jury, and the defendants' non-disclosure and denial of prompt access to the proceeds violated Section 10(b) and Rules 10b–5 and 10b–10. He argues that the district court applied an inappropriately narrow interpretation of the "in connection with" language of the relevant statute; incorrectly ruled as a matter of law that the yield differential due to the time period expansion was immaterial; overlooked the facts he pleaded to satisfy the scienter requirements of the federal securities laws; improperly deemed appellee Chemical a principal; incorrectly failed to recognize a fiduciary relationship between the appellees and the appellant; and erroneously determined that, as a matter of law, the markup was not excessive.

*Standard of Review*

 Dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is reviewed de novo. *See, e.g., Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). Factual allegations made in the complaint are assumed to be true, and all inferences are drawn in favor of the plaintiff. *Id.* Only if it appears to a certainty that a plaintiff could have proved no set of facts to sustain a claim for relief should the claim have been dismissed. *Id.*

*Federal Securities Laws*

Section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b), and Rules 10b–5 and 10b–10, 17 C.F.R. 240.10b–5 and 240.10b–10, promulgated thereunder prohibit fraudulent activities in connection with the purchase or sale of securities. Section 10(b) provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchanges-

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

SEC Rule 10b–5, promulgated pursuant to section 10(b), more specifically delineates what constitutes a manipulative or deceptive device or contrivance. *See* 17 C.F.R. § 240.10b–5. To state a claim for relief under Rule 10b–5, a plaintiff must allege that,

> in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury.

*In re Time Warner Inc. Secs. Litig.,* 9 F.3d 259, 264 (2d Cir.1993) (internal quotations omitted).

Rule 10b–10 specifies information that broker-dealers are required to disclose in writing to the customers at or before completion of a transaction. Included are the requirements that the broker or dealer disclose the date, time, and price of the transaction; the broker's or dealer's role as either agent or principal; and other information based on whether the broker or dealer is an agent or principal. *See* 17 C.F.R. § 240.10b–10.

*A. Markup Disclosure*

 A seller such as the defendant only has a duty to disclose the specifics of a markup—under the rubric of the obligation under Section 10(b) to "disclose material information"—when there is either a fiduciary relationship with the complaining party or when the markup is "excessive." *See Grandon,* 147 F.3d at 190 (addressing the "excessive" point); *see also Securities and Exch. Comm'n v. Feminella,* 947 F.Supp. 722, 728–29 (S.D.N.Y.1996). The appellant argued below that disclosure was needed both because there was a fiduciary relationship with the appellees and because the markup was exces-

sive, and the district court rejected both arguments.

The district court found that while

the determination as to whether a given markup is or is not excessive depends on a range of factors, the Court has no hesitation in finding that the defendants' markup here is as a matter of law not excessive. Simply put, the markup is indisputably at the extreme low end of what the SEC considers to be acceptable, and Press provides absolutely no authority for his contention that "the standard industry spread" for such a markup is five times *less* than what the defendants charged.

*Press,* 988 F.Supp. at 385–86 (internal citations omitted).

Although the district court was correct that the markup was not excessive, a more extensive examination was needed. We recently noted in *Grandon* that the determination of excessiveness is to be done on a case-by-case basis, and a markup is excessive "when it bears no reasonable relation to the prevailing market price." *Grandon,* 147 F.3d at 190 (*quoting Bank of Lexington & Trust Co. v. Vining–Sparks Secs., Inc.,* 959 F.2d 606, 613 (6th Cir.1992)). We discussed various factors to assess when determining whether municipal bonds are excessive and mentioned that, in limited cases, "we anticipate . . . that a trial court, as a matter of law, properly may conclude that a plaintiff has failed to state a claim that the markups were excessive." *Id.* at 193.

The SEC participates in this appeal as amicus. While its interpretation of the SEC rules is not binding, it warrants our consideration. *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 n. 10, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (stating that the "SEC's view of the proper balance between the need to insure adequate disclosure and the need to avoid the adverse consequences of setting too low a threshold for civil liability is entitled to consideration"); *Securities and Exch. Comm'n v. McNulty,* 137 F.3d 732, 741 (2d Cir.1998). It advocates not setting bright-line markup thresholds, but, rather, considering each transaction individually, in light of all relevant circumstances.

While the district court arguably did not use a bright-line rule, it did not analyze relevant factors extensively in a manner contemplated in *Grandon.* To say that a specific range of mark-ups is acceptable for a given line of financial product is to paint with a dangerously broad brush. A ten percent markup on a T-bill might be virtually always excessive. A ten percent mark-up on an instrument that is difficult to obtain and priced accordingly might not be. Among the factors relevant to the determination of whether a markup is excessive are the expense associated with effectuating the transaction, the reasonable profit fairly earned by the broker or dealer, the expertise provided by the broker or dealer, the total dollar amount of the transaction, the availability of the financial product in the market, the price or yield of the instrument, the resulting yield after the subtraction of the markup compared to the yield on other securities of comparable quality, maturity, availability, and risk, and the role played by the broker or dealer. *See generally Grandon,* 147 F.3d at 190 (discussing relevant considerations in assessing excessiveness of markups on municipal securities). We can say as a matter of law that, had the district court considered these factors in more detail, it would have been clear that the markup was not excessive.

This was not a complex transaction, yet there were efforts expended on the part of appellees. They had to, among other things, identify the appropriate instrument to purchase, arrange for its purchase, transfer the instrument to Press, and complete the corresponding paperwork. While this was an essentially riskless transaction, Press presented no compelling evidence of a more appropriate fee to be paid when comparing this transaction to other riskless transactions. While Press argued that the markup was blatantly excessive as a percentage of the yield, that argument ignores the fact that the comparison between the yield and the markup is not determinative. We suppose there may be cases where a $158 markup would be excessive, but Press has pointed to

no factor or medley of factors indicating that this is such a circumstance. We therefore affirm the district court's determination that the markup in this case is not excessive as a matter of law.[3]

■ With respect to the appellant's argument that his relationship with the appellees was a fiduciary one, such that they were obligated to disclose the markup, the district court held that appellant could not contend that the appellees owed him a fiduciary duty under New York law as he alleged absolutely nothing to indicate that the appellees "had any discretionary authority whatever with respect to the transaction they executed on his behalf." *Press*, 988 F.Supp. at 387. The court stated that the appellees' "sole function was to purchase and eventually pay over the proceeds of a single instrument specifically chosen by [Press]," which precluded the argument that any relationship existed other than that accompanying a "single, armslength transaction." *Id.*

■ The appellee and the district court correctly cited authority for the proposition that, in the context of an ordinary broker-client relationship, the broker owes no fiduciary duty to the purchaser of the security. *See Perl v. Smith Barney Inc.*, 230 A.D.2d 664, 666, 646 N.Y.S.2d 678, 680 (First Dep't 1996). While this position is soundly based in New York law, there is some case law to the contrary. *See Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d Cir.1994) ("The relationship between a stockbroker and its customer is that of principal and agent and is fiduciary in nature, according to New York law."). Specifically, "the fiduciary obligation that arises between a broker and a customer as a matter of New York common law is limited to matters relevant to affairs entrusted to the broker," *Rush v. Oppenheimer & Co.*, 681 F.Supp. 1045, 1055 (S.D.N.Y.1988); the scope of the entrusted affairs generally is thus limited to the completion of the security transaction. *See Bissell v. Merrill Lynch &*

*Co.*, 937 F.Supp. 237, 246 (S.D.N.Y.1996); *see also* Restatement (Second) of Torts § 874 cmt. a ("A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.").

The two lines of case law can, of course, be reconciled. The cases that have recognized the fiduciary relationship as evolving simply from the broker-client relationship have limited the scope of the fiduciary duty to the narrow task of consummating the transaction requested. *See Bissell*, 937 F.Supp. at 246: *Saboundjian v. Bank Audi*, 157 A.D.2d 278, 283, 556 N.Y.S.2d 258, 261 (First Dep't 1990); *cf. Busch v. L.F. Rothschild & Co.*, 23 A.D.2d 189, 190, 259 N.Y.S.2d 239, 240 (First Dep't 1965). Simply put, "[t]he fiduciary obligation that arises between a broker and a customer as a matter of New York common law is limited to matters relevant to affairs entrusted to the broker." *Rush*, 681 F.Supp. at 1055.

Given that the relationship between Press and the appellees was limited to the single transaction of purchasing the T-bill, the appellees had the duty to consummate the transaction. *See Saboundjian*, 157 A.D.2d at 283, 556 N.Y.S.2d at 260. As well, the appellees had the "duty to use reasonable efforts to give [Press] information relevant to the affairs that [had] been entrusted" to them. *Conway*, 16 F.3d at 510. But what, then, is "information relevant to the affairs that have been entrusted" to the appellees? Some information borders on insignificant minutia, the omission of which could never be actionable for fraud. Some information is clearly significant and must be disclosed accurately. Some information, however, falls into a grey area of possible insignificance and possible significance. And in this grey area is where we find disclosure of the amount of the markup.

---

**3.** At oral argument, the point was made that the district court opinion unclearly addressed the markup issue. Either the district court determined that the $158 markup was not excessive as a matter of law and future markups of the same amount would not be excessive, or the district court determined that the $158 markup was not excessive as a matter of law in these circumstances, after considering the relevant factors. We interpret the district court's determination to be of the latter, more narrow, holding, and we affirm accordingly.

We can find no case law applying New York's fiduciary requirements in a manner supporting the broad proposition that all markups must be disclosed in the course of a normal T-bill purchase due to the fiduciary nature of the seller-purchaser relationship. So to hold would be to set a per se disclosure rule for markups on T-bills absent precedential justification. At this time, we decline to do so. The point surely can be revisited in the future, should New York's law evolve in a manner that indicates that more disclosure is merited.

Therefore, no claim for failure to disclose a markup due to the fiduciary nature of Press's relationship with appellees can be sustained.

### B. Yield Delay

The district court dismissed appellant's claim that he was improperly denied prompt access to the proceeds of his T-bill for three reasons. We disagree with two of the three stated reasons for the dismissal, but we affirm on the remaining one.

*"In Connection With"*

The district court held that the appellant's claim that he was improperly denied prompt access to the proceeds of his T-bill must fail because he did not allege that the misrepresentation at issue was directly enough related to the value of the security to fit into the 10(b) rubric of "in connection with." This is incorrect.

 Tangential misrepresentations about a security are insufficient to support a claim under Section 10(b). However, the district court erred in determining that the non-disclosure of the fact that the T-bill proceeds at maturity would not be available until days after maturity was a procedural non-disclosure, not going to the investment purpose of the sale. *Press,* 988 F.Supp. at 389. The Supreme Court has instructed that "Section 10(b) must be read flexibly, not technically and restrictively." *Superintendent of Ins. of New York v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). The Second Circuit has broadly construed the phrase "in connection with," interpreting the Congressional intent underlying the phrase to mandate only that the act

complained of somehow induced the purchaser to purchase ,the security at issue. *See Securities and Exch. Comm'n v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860–61 (2d Cir. 1968) (en banc); *see also In re Carter–Wallace, Inc. Securities Litigation: Brunjes v. Hoyt,* 150 F.3d 153, 156 (2d Cir.1998) (*quoting Texas Gulf*).

The district court maintained that since the yield availability date did not pertain to the security itself nor to its value, the possible omission with respect to the date was not "in connection with" the sale of a security. *See Press,* 988 F.Supp. at 389. This reasoning, however, seems to confuse the materiality analysis with the "in connection with" analysis.

Assume, arguendo, that the appellees did not give the appellant access to his money for three months after it matured. Surely that would satisfy the "in connection with" requirement, in that the practice would "touch" the purchase of a security within the broad protections of Section 10(b). *See Superintendent of Ins. of New York,* 404 U.S. at 12, 92 S.Ct. 165 ("Since there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under § 10(b). . . ."). Press's situation is simply different in degree, not substance. To the extent that the degree of violation is an issue, it is an issue of materiality. Thus, the alleged yield delay was "in connection with" the sale of the security.

*Scienter*

The district court found that "Press's proceeds claim also fails to meet the special requirements for pleading scienter under Rule 9(b). . . . [T]he Court cannot find that the facts alleged in Press's Complaint concerning the date on which his proceeds became available raise a sufficient inference of fraudulent intent to survive a motion to dismiss." *Press* at 390.

 Under Section 10(b) and Rule 10b–5, a plaintiff is required to prove that the defendant, in effectuating an allegedly fraudulent sale, acted with scienter. *See Securities and Exch. Comm'n v. First Jersey Secs., Inc.,* 101 F.3d at 1467. The Private Securities Litigation Reform Act of 1995 height-

ened the requirement for pleading scienter to the level used by the Second Circuit: Plaintiffs must " 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " 15 U.S.C. § 78u–4(b)(2). The scienter needed in connection with securities fraud is intent "to deceive, manipulate, or defraud," or knowing misconduct. *First Jersey Secs., Inc.*, 101 F.3d at 1467. As a pleading requirement, a plaintiff must either (a) allege facts to show that "defendants had both motive and opportunity to commit fraud" or (b) allege facts that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994); *see also Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996).

The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences. *See, e.g., In re Time Warner Inc. Secs. Litig.*, 9 F.3d at 270–71. "Whether a given intent existed is generally a question of fact," appropriate for resolution by the trier of fact. *Grandon*, 147 F.3d at 194; *see First Jersey Secs., Inc.*, 101 F.3d at 1467 ("Whether or not a given intent existed, is, of course, a question of fact."). Though the Second Circuit has resisted accepting general allegations of scienter that would lead to the presumption of motive for any publicly-held corporation that "desires its stock to be priced highly by the market," *Chill*, 101 F.3d at 268 n. 5, we are not inclined to create a nearly impossible pleading standard when the "intent" of a corporation is at issue.

In this case, Press barely alleged motive and opportunity, but he nonetheless satisfied the pleading standards. Press pled that the appellees had a motive to keep possession of his proceeds to have the "float" or use of the funds, and he pled that the appellee had the opportunity to do this since the proceeds of the T-bill at maturity were in their control. While this is the barest of all pleading that would be acceptable, we cannot take this issue of fact from the finder of fact. *See Grandon*, 147 F.3d at 194. To require more in pleading of motive as appellees would have us read *Chill*, 101 F.3d at 268 or

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.1995) would make virtually impossible a plaintiff's ability to plead scienter in a financial transaction involving a corporation, institution, bank or the like that did not involve specifically greedy comments from an authorized corporate individual. We refuse so to hold at the pleading stages.

*Material Factor*

The district court determined that Press's claim that he purchased the bill in reliance on the fact that the funds would be immediately available on the day of maturity failed for lack of showing of materiality, as Press could not show that the one-day delay in availability of the funds (or four-day delay in receipt of a check for the funds) would have been a material factor in the decision whether to purchase the bill.

The Supreme Court has defined material information (in the proxy context) as information that would have "assumed actual significance in the deliberations of the reasonable shareholder." *TSC Indus.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540 (2d Cir.1996) (quoting *TSC Indus.*). The determination of materiality is a mixed question of law and fact that generally should be presented to a jury. *See TSC Indus.*, 426 U.S. at 439, 96 S.Ct. 2126; *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir.1991). The total mix of information available and the relevant circumstances must be considered. *Cf. TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126. Only if no reasonable juror could determine that the undisclosed delay in receipt of proceeds at maturity would have "assumed actual significance in the deliberations of the reasonable [investor]" should materiality be determined as a matter of law. *See, e.g., Kramer v. Time Warner, Inc.*, 937 F.2d 767, 777 (2d Cir.1991).

While, at first blush, a yield delay of a day, or two, or four—especially involving a weekend—seems fairly insignificant, it takes little thought to envision a situation where the availability date for the proceeds of investment would be of great import to a reasonable investor. Where the funds invested

are large, and the time very short, a delay of a single day could result in a considerable loss of interest income, and therefore be of material concern to the reasonable investor. However, on the facts presented in this case, we believe that, as a matter of law, a one-day delay cannot be material, nor, as a matter of law, can a four-day delay be material where the investor has opted for delivery of a check by mail and the "delay" is due to mailing time rather than delay in placing the check in the mail. Transactions take time, and a funds-transfer is no exception, as any reasonable investor would know. Absent explicit representations that funds will be available on a particular date, no reasonable juror would find that this short delay would have "assumed actual significance in the deliberations of the reasonable [investor]." *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. 2126. As the Supreme Court noted in *Basic, Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Court has been "careful not to set too low a standard for materiality." *Id.; see also Feinman,* 84 F.3d at 540. The delays in this case fall well below the materiality threshold set by the Supreme Court.

*Reliance*

▮ Reliance, also referred to as "transaction causation," is an essential element of a section 10(b) and Rule 10b–5 claim. *See Feinman,* 84 F.3d at 541. Reliance can be presumed in some cases of omission or non-disclosure, *see Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), but "only where the defendant has misrepresented or omitted a material fact," *Feinman,* 84 F.3d at 541. As we have discussed, the delay was not material for purposes of a securities fraud claim. We therefore affirm the district court's dismissal of Press's claim for fraudulent failure to disclose the funds availability delay.

*C. Yield Misrepresentation*

▮ In response to the appellant's allegations that the appellees misrepresented the yield in violation of Rule 10b–5 by not disclosing initially that the settlement date was

the date from which the yield was calculated, the district court held that the difference between the 178 and 181 days (the difference between the settlement and trade days) was "immaterial as a matter of law" in view of the "trivial monetary equivalent of a three-day expansion in the maturity period." *Press,* 988 F.Supp. at 388.

Having above detailed the specifics of a materiality assessment, we need not discuss them again. Calculating the yield per day over the 178 versus 181 days, we find that the appellant was deprived of an insignificant amount of money. It can be definitively said that a reasonable juror could not determine that this three-day difference in the yield would have "assumed actual significance in the deliberations of the reasonable shareholder" given the maturity value of the T-bill, the yield, and the markup. *See, e.g., Kramer,* 937 F.2d at 777. Surely there may be some cases where a time delay causes a monetary deprivation so great that it is material and the failure to disclose is misrepresentation. This, however, is not such a situation.

The district court's dismissal of the yield misrepresentation claim is affirmed.

*D. Rule 10b–10 Violations*

▮ Press contends that Chemical was acting as an agent in the T-bill transaction, such that Chemical had the obligation to disclose, under Rule 10b–10, 17 CFR § 240.10b–10(a)(2), the "remuneration received ... in connection with the transaction" and the "yield to maturity" of the bill. 17 CFR § 240.10b–10(a)(2)(i)(B). This argument is insupportable, on these facts.

The confirmation slip sent by Chemical to Press states that Chemical was acting as a "principal" in the T-bill transaction, as opposed to acting as an agent. Appellant maintains, however, that Chemical's own assertion on the confirmation slip that it was acting as a principal should not be determinative.

Without addressing whether Chemical's indication on the confirmation slip should be determinative, we conclude that Press has presented no compelling argument to support the position that Chemical was acting as

an agent. While Chemical might have purchased the T-bill to fill Press's order, the telling point is that Chemical took ownership of the T-bill and then sold it from its own account to Press. Even according to Press's definitions, that would classify Chemical as a principal in this transaction. *See* Corrected Brief of Plaintiff–Appellant at 28, *Press v. Chemical Inv. Servs.* (2d Cir.1998) (98–7123) ("A 'principal' sells a security from its own account in order to fill a customer's order."). While the appellant would still maintain that under 17 CFR § 240.10b–10(a)(8)(i)(D) there is the obligation to disclose, we do not read this section so to mandate. The district court's dismissal of the Rule 10b–10 claims is affirmed.

*Conclusion*

For the above stated reasons, the district court is affirmed.