OPINION OF THE COURT
Eileen Bransten, J.
Defendants Utrecht-America Finance Co. (UAFC) and Cooperatieve Céntrale Raiffeisen-Boerenleenbank, B.A., Rabobank Nederland (Rabobank) (collectively defendants) move for partial summary judgment establishing the measure of damages for which they may be liable. Plaintiff Credit Suisse First Boston (CSFB or plaintiff) opposes.
Background
CSFB is a global investment bank. (Complaint 1Í 4.)
UAFC is a Delaware corporation and subsidiary of Rabobank. Rabobank is a global bank headquartered in the Netherlands. (Id. 1111 5, 6.)
UAFC had a $45 million interest in a $485 million syndicated bank loan to an entity called Choctaw Investors, B.V (Choctaw). Choctaw had been a financing vehicle for the Enron Corporation prior to Choctaw’s dissolution in March of 2003. (Affirmation of H. Rowan Gaither IV in support of plaintiffs opposition to defendants’ motion for partial summary judgment, exhibit 2; decision and order, Feb. 2, 2010, Bransten, J., at 2-3; complaint 1119.)
CSFB alleges that on October 28, 2003, it and UAFC orally agreed that CSFB would purchase $15 million of Choctaw’s distressed debt for 62.5% of the debt’s face value. The parties’ agreement was memorialized in a written confirmation dated November 5, 2003. (Complaint Uli 9, 11.)
Prior to CSFB and UAFC effectuating their agreement, in early January 2004, the market value of Choctaw debt began to rise. On January 13, 2004, Choctaw debt was trading at 75% of its face value. That day, UAFC orally informed CSFB that UAFC was terminating the Choctaw deal. UAFC sent CSFB written confirmation of the termination on January 14, 2004. (Id. 1111 26-28.)
The market value of Choctaw debt continued to rise after January 14, 2004. On February 27, 2004, CSFB allegedly purchased a comparable amount of Choctaw debt from a third *881 party for an allegedly higher price than it had contracted to pay for Choctaw debt from UAFC. {Id. If If 32, 35.)
In this motion, defendants seek partial summary judgment limiting CSFB’s damages to the difference between the contract price which CSFB agreed to pay UAFC for Choctaw debt and the market value of that debt on January 14, 2004.
Analysis
I. Summary Judgment
“[T]he proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact. Failure to make such a prima facie showing requires a denial of the motion, regardless of the sufficiency of the opposing papers.” (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986] [citations omitted].)
Upon making such a showing, the burden of proof shifts to the party opposing the motion. {Id.) In order to defeat the motion, the opposing party “must produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact on which he rests his claim” or an acceptable reason for his failure to do so. (Zuckerman v City of New York, 49 NY2d 557, 562 [1980].)
II. Defendants are Not Entitled to Partial Summary Judgment
Defendants seek partial summary judgment limiting CSFB’s damages to the difference between the contract price which CSFB agreed to pay UAFC for Choctaw debt and the market value of that debt on January 14, 2004.
Plaintiff argues in opposition that it is premature to determine the measure of damages prior to trial. Plaintiff argues that New York courts routinely apply different measures of damages and that in order to properly determine the measure of damages requires a full factual record. (Plaintiffs mem in opposition to defendants’ motion for partial summary judgment at 13-18.)
Defendants argue that New York law assesses damages at the time and place of the breach. (Defendants’ mem in support of motion for partial summary judgment dismissing the complaint to the extent plaintiff seeks the recovery of damages that are not available as a matter of law at 6-15; defendants’ reply mem in support of motion for partial summary judgment dismissing the complaint to the extent plaintiff seeks the recovery of dam *882 ages that are not available as a matter of law at 1-5.) Defendants further argue that plaintiffs have not shown that other measures of damages are available in the instant case. (Defendants’ reply mem at 6-11.)
Generally, “[t]he proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of the breach.” (Simon v Electrospace Corp., 28 NY2d 136, 145 [1971].) This general rule does not concern itself with fluctuations in value that occur subsequent to the breach. (Kaminsky v Herrick, Feinstein LLP, 59 AD3d 1, 11-12 [1st Dept 2008]; Castle Coal & Oil Co. v Frank’s Fuel, 69 AD2d 795, 795 [1st Dept 1979]; Orange & Rockland Util. v New England Petroleum Corp., 60 AD2d 233 [1st Dept 1977].) Under this rule, where the breach in question involves the failure to deliver an asset, damages are determined by the difference between the contract price for the asset and the fair market value of the asset at the time of breach. (Cole v Macklowe, 64 AD3d 480, 480 [1st Dept 2009]; Kaminsky, 59 AD3d at 11; Aroneck v Atkin, 90 AD2d 966, 966 [4th Dept 1982].)
However, plaintiff is correct that New York courts apply different measures of damages in different situations.
Lost profits may be awarded where such lost profits are a natural consequence of the breach, where that measure of damages was contemplated by the parties when the contract was formed and where the lost profits asserted are capable of reasonably accurate measurement. (Ashland Mgt. v Janien, 82 NY2d 395, 404 [1993]; Awards.com v Kinko’s, Inc., 42 AD3d 178 [1st Dept 2007].)
UCC article 2 provides cover damages as a remedy in certain situations involving the sale of goods. (UCC 2-712 [“After a breach . . . the buyer may ‘cover’ by making in good faith and without unreasonable delay any reasonable purchase of . . . goods in substitution for those due from the seller . . . The buyer may recover from the seller . . . the difference between the cost of cover and the contract price”].) Although article 2 specifically excludes “investment securities” from the definition of “goods,” “the courts, relying upon the Official Comment to section 2-105, have held that a buyer’s remedies for breach of contract as set forth in Article 2 will apply to security transactions by analogy.” (G. A. Thompson & Co., Inc. v Wendell J. Miller Mortg. Co., Inc., 457 F Supp 996, 998-999 [SD NY 1978] [applying New York law].) In G. A. Thompson & Co., Inc., the court awarded the plaintiff cover damages — the difference be *883 tween the contract price to purchase underlying securities and the price paid by the plaintiff to purchase the same securities from another source — when the defendant failed to deliver and the plaintiff was obligated to resell the contracted-for securities. (457 F Supp at 997; see also Brown v Pressner Trading Corp., 101 AD2d 761, 762 [1st Dept 1984] [finding that “(w)hen a broker wrongfully fails to purchase or sell a security as directed, the customer’s damages are limited to the cost of covering or replacing the security. If the customer fails to cover within a reasonable time, damages are limited to the potential cost to cover, measured from the time he learns of the broker’s failure and for a reasonable time thereafter”]; Saboundjian v Bank Audi [USA], 157 AD2d 278, 284 [1st Dept 1990] [“liability is limited to the difference between the price at which the plaintiff could have executed the trade at issue, were it not for the failure to carry it out, and the price at which he could have executed the transaction within a reasonable time after he learned that it had not been effected earlier”].)
The appropriate measure of damages thus depends on the facts of the case. To that end, we agree with plaintiff that in order to determine the proper measure of damages, the court will require a complete factual record. Indeed, “[t]here is no rule of thumb to be applied to any given set of facts. We must look to the nature of the contract and the circumstances surrounding its breach.” (Dillon v Magner, 29 AD2d 759, 760 [2d Dept 1968], quoting New York Water Serv. Corp. v City of New York, 4 AD2d 209, 213 [1st Dept 1957].)
Importantly, New York law aims to place the nonbreaching party in as good a position as it would have been but for the breach. (Xand Corp. v Reliable Sys. Alternatives Corp., 63 AD3d 724, 725 [2d Dept 2009].) It is unclear if that goal would be accomplished under the rule that damages are assessed as of the time and place of the breach if plaintiff is correct in its assertion that the market for Choctaw debt was highly illiquid.
It is further unclear on the record before the court that the court should not treat Choctaw debt as a security or as a good within the meaning of the UCC, or extend the remedies of UCC article 2 to the instant case by analogy. The record is insufficient to establish whether the Choctaw debt fits the broad and commonly employed definition of an investment contract and, thereby, a security as articulated by the Supreme Court in SEC v W.J. Howey Co., as an investment scheme that “involves an investment of money in a common enterprise with profits to *884 come solely from the efforts of others.” (328 US 293, 301 [1946]; see also SEC v Edwards, 540 US 389, 393 [2004].) Similarly, the incomplete factual record does not disclose whether or not the court should treat the Choctaw debt as a good in the same manner as New York courts have treated foreign currency as a good (Saboundjian, 157 AD2d at 284-285).
The parties offer differing, if not incomplete, accounts of the structure and liquidity of the market for Choctaw debt, CSFB’s involvement in that market, and the nature of the investment itself. Making the plaintiff whole will require the court to have a fuller understanding of Choctaw distressed debt and also trading of distressed debt, generally — a subject about which, owing to the relative newness of distressed debt trading, there is a surprising dearth of relevant case law.
Furthermore, if the court finds that cover damages are the appropriate measure of damages here, the court must then determine whether plaintiff’s delay in purchasing replacement debt from another source was “reasonable” in light of the circumstances. The factual record before the court is insufficient to do so.
Defendants have not made a prima facie showing of entitlement to judgment as a matter of law and, therefore, partial summary judgment on the issue of damages is denied.
Accordingly, it is ordered that defendants’ motion for partial summary judgment is denied.